# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COURTNEY THOMPKINS, EZRA DIXON, and KIM NEAL | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| CITY OF MCKEESPORT, ALLEGHENY COUNTY, MARK STEELE, in his individual and official capacities, ADAM ALFER, in his individual and official capacities, COLEMAN MCDONOUGH, in his individual and official capacities, BRENDA SAWYER, DANTE DIBERADIN, in his individual and official capacities, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JOHN DOE 13, JOHN DOE 14, JOHN DOE 15, JOHN DOE 16, JOHN DOE 17, JOHN DOE 18, JOHN DOE 19, JOHN DOE 20, JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE DOE 10, JANE DOE 11, JANE DOE 12, JANE DOE 13, JANE DOE 14, JANE DOE 15, JANE DOE 16, JANE DOE 17, JANE DOE 18, JANE DOE 19, and JANE DOE 20 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 2:24-cv-00008<br><br>Chief Judge Mark R. Hornak<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Courtney Thompkins, Ezra Dixon, and Kim Neal (collectively, "Plaintiffs"), by and through their undersigned counsel, ACLU of Pennsylvania and Reed Smith LLP, hereby file this First Amended Complaint against the City of McKeesport, Allegheny County, Mark Steele, in his individual and official capacities, Adam Alfer, in his individual and official capacities, Coleman McDonough, in his individual and official capacities, Brenda Sawyer, and the John and Jane Doe defendants (collectively, "Defendants"), and in support thereof, state as follows:

## I.      INTRODUCTION

1.      This is an action for violation of the constitutional rights of Plaintiffs, arising out of Defendants' conduct, under the color of state law, related to unlawful warrantless searches and seizures of Plaintiffs, their residences, and their vehicles in December 2020. In the course of a days-long manhunt, Defendants violated the rights of Plaintiffs (among other Black residents of McKeesport) under the Constitution of the United States, the Constitution of the Commonwealth of Pennsylvania and federal and state statutes, causing Plaintiffs substantial harm.

2.      Officers of the McKeesport Police Department and the Allegheny County Police Department (collectively, and including the John and Jane Doe defendants, the "Police Defendants") led a series of unlawful and aggressive searches and seizures of Plaintiffs, their families, and their neighbors. Police Defendants held Plaintiffs and their children at gunpoint, despite lacking probable cause or other lawful basis to conduct any searches of Plaintiffs.

3.      The unlawful searches apparently were conducted as part of the effort to find and arrest Koby Lee Francis, who at the time was being sought for shooting McKeesport Police Officer Gerasimos Athans on December 20, 2020, in McKeesport, Pennsylvania. According to public reports, the McKeesport Police attempted to arrest Mr. Francis on December 20, 2020, for

allegedly violating a protection-from-abuse order. During the course of the arrest, Mr. Francis shot Mr. Athans, and fled the scene. Mr. Francis was eventually arrested on December 29, 2020, in Clarksburg, West Virginia, and Mr. Athans fortunately survived the shooting.

4.      Each Plaintiff is a Black resident of McKeesport who was subjected to police abuses during the course of the manhunt for Mr. Francis.

5.      Two of the three Plaintiffs in this action—Ms. Thompkins and Mr. Dixon—had and have no meaningful connection to Mr. Francis. Both were subject to more intensive and aggressive searches than white residents of McKeesport who had connections to Mr. Francis.

6.      Ms. Neal is Mr. Francis's mother; however, that familial relationship does not outweigh the federal and state constitutional rights that protect her from unreasonable search and seizure. Mr. Francis did not live in Ms. Neal's home and was an adult at the time of his attempted escape. Defendants lacked probable cause to believe Mr. Francis was in Ms. Neal's home or car, yet repeatedly subjected Ms. Neal to unlawful searches and seizures, which exceeded the limits of Defendants' lawful authority and violated Ms. Neal's constitutional rights.

7.      The Police Defendants' unlawful actions during the December 2020 manhunt in McKeesport—including swarming and detaining Plaintiffs and other Black residents of McKeesport at gunpoint, subjecting them to abusive warrantless searches of their homes, and applying excessive force during unjustified traffic stops—traumatized Plaintiffs, leaving them more fearful of the police.

8.      The Police Defendants used violence, intimidation and unwarranted force while searching Plaintiffs without any probable cause or individualized suspicion. Meanwhile, the same police treated white residents of the same McKeesport neighborhoods—including those who had some connection to Mr. Francis—much less harshly than they treated Plaintiffs

## II.      JURISDICTION AND VENUE

9.      Plaintiffs reside in McKeesport, Pennsylvania, a city in Allegheny County, Pennsylvania.

10.      Defendants are headquartered and operate in, are employed in, and/or reside in Allegheny County, Pennsylvania.

11.      On December 4, 2023, Plaintiffs filed a Complaint in the Court of Common Pleas of Allegheny County.

12.      On January 3, 2024, Defendants removed this action under 28 U.S.C. § 1441 on the grounds that this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that one or more Defendants resides in this district and all Defendants are residents of Pennsylvania; and/or under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.      FACTUAL BACKGROUND

### A.      Plaintiffs

14.      Courtney Thompkins is a Black resident of McKeesport with no meaningful connection to Koby Lee Francis.

15.      Ezra Dixon is a Black resident of McKeesport with no connection to Koby Lee Francis.

16.      Kim Neal is a Black resident of McKeesport and the mother of Koby Lee Francis.

### B.      Defendants

17.      **City of McKeesport** is a governmental entity duly organized under the laws and statutes of the Commonwealth of Pennsylvania, with its municipal offices located at 500 Fifth

Avenue, McKeesport, Pennsylvania 15132. The City of McKeesport is empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinance within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of the City of McKeesport. The City of McKeesport controls and operates the City of McKeesport Police Department (hereinafter "McKeesport Police" or the "McKeesport Police Department"). On information and belief, the McKeesport Police Department employs approximately 36 full-time and 3 part-time officers. It is one of the few departments in Allegheny County with its own Detective Bureau and Traffic Division. Individuals within the McKeesport Police Department— namely the Chief of Police and Assistant Chief of Police—are policymakers with respect to policing within the City of McKeesport and decisions made by these officials represent decisions made by the city itself. Thus, when they make a deliberate choice to follow a particular course of action, that choice represents official policy.

18.     **Allegheny County** is a county in the Commonwealth of Pennsylvania maintaining an office at 542 Forbes Avenue, Pittsburgh, Pennsylvania 15219. Allegheny County is empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinance within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of Allegheny County. Allegheny County controls and operates the Allegheny County Police Department. On information and belief, the Allegheny County Police Department employs over 210 officers. The Superintendent of the Allegheny Police Department is a policymaker with respect to policing within Allegheny County and decisions made by the Superintendent represent a decision by the

County government itself. Thus, when the Allegheny Police Department makes a deliberate choice to follow a course of action, that choice represents official policy.

19.     **Adam Alfer** was the Chief of the McKeesport Police Department at the time of the events described herein. Mr. Alfer was at all relevant times in a policymaking position at the McKeesport Police Department whose actions represent a decision by the McKeesport Police Department itself. Thus, when Mr. Alfer made a deliberate choice to follow a course of action, that choice represented official policy.

20.     **Mark Steele** was the Assistant Chief of the McKeesport Police Department at the time of the events described herein and currently is the Chief of the McKeesport Police Department.[1] Mr. Steele was at all relevant times in a policymaking position at the McKeesport Police Department whose actions represented a decision by the McKeesport Police Department itself. Thus, when Mr. Steele made a deliberate choice to follow a course of action, that choice represented official policy.

21.     **Coleman McDonough** is the former Superintendent of the Allegheny County Police Department, having served in the position from June 2016 to March 2021, which includes the time of the events described herein. Mr. McDonough was in a policymaking position at the Allegheny County Police Department whose actions represent a decision by the McKeesport Police Department itself. Thus, when Mr. McDonough made a deliberate choice to follow a course of action, that choice represented official policy.

22.     **Dante Diberadin** was a police officer with the McKeesport Police Department at the time of the events described herein.

---

[1] *See* Taylor Spirito, *McKeesport swears in new police chief*, WPXI (Oct. 6, 2023), https://www.wpxi.com/news/local/mckeesport-swears-new-police-chief/PAUBDPSWJFHXJIYXTZBWOFQBBI/.

23.     **Brenda Sawyer** is a well-known member of the McKeesport community, in part because she was the first Black woman to be a police officer in McKeesport. Though she left the McKeesport Police Department before December 2020, she continued her career in law enforcement, including as a regional director of the state Attorney General's Bureau of Narcotics Investigations & Drug Control. To date, she has over 30 years of law enforcement experience. She was also present with her former colleagues of the McKeesport Police Department to facilitate and participate in the Police Defendants' unlawful searches and seizures of McKeesport residents in December 2020.

### C.     Defendants' Unlawful and Racially Motivated Searches of Plaintiffs

24.     On and after December 20, 2020, the Police Defendants and other individuals acting under color of state authority subjected Ms. Thompkins, Mr. Dixon, and Ms. Neal to abusive searches despite lacking probable cause or any individualized suspicion.

25.     Such unlawful searches were conducted of the homes and vehicles of Plaintiffs and, on information and belief, the homes and vehicles of several other Black residents of McKeesport. This conduct was captured in contemporaneous news reports. For example, on December 22, 2020, KDKA published an article, titled *Police Accused of Executing Aggressive, Warrantless Searches in Hunt for McKeesport Shooting Suspect Koby Francis*,[2] providing witness accounts of McKeesport Police conducting searches of homes without warrants or permission. Plaintiffs are three of the McKeesport residents who were victims of this police overreach beginning on December 20, 2020.

26.     Plaintiff **Courtney Thompkins** is Black and a resident of McKeesport. She has no direct connection to Mr. Francis and bears no resemblance to him.

---

[2] *Police Accused of Executing Aggressive, Warrantless Searches in Hunt for McKeesport Officer Shooting Suspect Koby Francis*, CBS NEWS PITTSBURGH (Dec. 22, 2020).

27.     On December 20, 2020, Ms. Thompkins noticed that her partner, Howard Gibbons, was stopped near their shared home by two John Doe Police Defendants while Mr. Gibbons was in his vehicle on his way to work. Ms. Thompkins went to her front door with plans of going outside to find out what was going on. Instead, immediately upon opening her front door, Ms. Thompkins was confronted by Police Defendants in tactical gear with guns drawn and pointed at her head. It was then that Ms. Thompkins noticed Police Defendants were pointing their guns at Mr. Gibbons's head too. Ms. Thompkins, now at the wrong end of government-issued firearms, was scared, confused, and surrounded.

28.     Approximately more than ten officers—including the John and/or Jane Doe defendants—surrounded Ms. Thompkins's home—front, back, and both sides. Several officers in tactical gear had their guns pointed directly at Ms. Thompkins when she opened her front door. Police demanded to enter Ms. Thompkins's home without telling her why they were there. Ms. Thompkins did not want Police Defendants—including a superior officer in a white shirt,[3] and a John Doe defendant, whom Ms. Thompkins recognized because he used to play basketball with her son—in her home. With guns pointed directly at her, and out of fear for her life, Ms. Thompkins reluctantly submitted to Police Defendants' coercive demands to search her home. Along with the two aforementioned Police Defendants, two more John Doe Police Defendants, entered Ms. Thompkins's home and searched.

29.     At no point did any police officer present Ms. Thompkins with a search warrant or an arrest warrant for Mr. Francis, nor did any officer articulate any basis for believing that Mr. Francis might be found in her home. In fact, Police Defendants never said they were even looking for Mr. Francis.

---

[3] Ms. Thompkins believes, but cannot confirm without discovery, that the superior officer in the white shirt may have been either Defendant Steele or Defendant Alfer.

30.     Police Defendants continued to have their weapons trained on Ms. Thompkins as they searched her home until Ms. Thompkins brought it up with the superior officer, who then ordered the searching officers to lower their weapons.

31.     As the home search continued, Defendant Sawyer was on the scene speaking with Ms. Thompkins's partner outside the home. Police Defendants detained Mr. Gibbons, Ms. Thompkins's partner, in his vehicle throughout the duration of the search. Defendant Sawyer asked him questions as the home search commenced. Defendant Sawyer eventually told Mr. Gibbons that he was free to leave, but would not allow him to go back inside the home he shared with Ms. Thompkins. Mr. Gibbons left the scene and went to work.

32.     Then, Defendant Sawyer went inside the home. Ms. Thompkins cannot recall whether Defendant Sawyer was wearing a police vest or showed a badge; however, even without such indicators, Defendant Sawyer appeared to Ms. Thompkins to be a member of law enforcement based on the way she represented herself and worked with Police Defendants searching Ms. Thompkins's home.

33.     Ms. Thompkins had no meaningful connection to Mr. Francis at the time of the warrantless search, and the police had no probable cause to suspect he could be found in her home. Ms. Thompkins's only conceivable connection to Mr. Francis was that, when Mr. Francis was five or six years old, he attended an after-school program where Ms. Thompkins worked. Additionally, one of Ms. Thompkins's sons had been friendly with Mr. Francis when both were children, but Mr. Francis—even as a child—had never been in her home, and Ms. Thompkins's adult son had not lived in her home for years prior to the December 2020 searches. This past, minor attenuated connection did not justify an aggressive warrantless search of Ms. Thompkins's home during a search for Mr. Francis.

34.     Likewise, Mr. Gibbons had no connection to Mr. Francis. Additionally, Mr. Gibbons—apart from being a Black man—does not resemble Mr. Francis in appearance. At the time, Mr. Francis was 22 years old, had very short hair, was "6 feet 2 inches tall," and was described as having a "thin build."[4] Mr. Gibbons was 41 years old at the time, had dreadlocks to his mid-back, and did not have a thin build. Mr. Gibbons could not reasonably be mistaken for Mr. Francis.

35.     One of Ms. Thompkins's neighbors on the same street actually had a connection to Mr. Francis, but that neighbor lived several houses away from Ms. Thompkins. One of the residents of that neighboring home was dating Koby Lee Francis's brother at the time of the search and was ultimately prosecuted for aiding Mr. Francis's escape. The primary resident of that neighboring home is a white woman who lived there with at least one of her children, who is biracial—both Black and white. Despite the white neighbor's known connection to Mr. Francis, the neighbor was not subjected to nearly the same level of police intrusion, intimidation, or abuse as Ms. Thompkins and other Black residents of McKeesport.

36.     Plaintiff **Ezra Dixon** is Black and a lifelong resident of McKeesport. He has no connection to Mr. Francis and bears no resemblance to him.

37.     On the night of December 20, 2020, Mr. Dixon was driving with a friend and an acquaintance, attempting to return home from getting food, when police stopped the car near a police roadblock. When Mr. Dixon attempted to avoid traffic by turning to go in a different direction, a police car raced to cut him off, pulled him over, and demanded to search the car.

38.     Initially, two police officers—Defendant Dante Diberadin and a John Doe McKeesport Police Officer—pulled over Mr. Dixon and his fellow passengers.

---

[4] Dillon Carr & Tony Larussa, *Police ask public's help to find man accused of shooting McKeesport officer outside station*, TRIB LIVE (Dec. 20, 2020, 5:47 PM), https://triblive.com/local/report-officer-shot-in-mckeesport/.

39.     While nobody in the car had been smoking or was in possession of cannabis, Defendant Diberadin baselessly claimed that he smelled cannabis in order to fabricate a reason to search the car absent any actual probable cause or reasonable and particularized suspicion to believe they would find evidence of any crime.

40.     Defendant Diberadin asked the passengers for their names and identification. Defendant Diberadin never mentioned Mr. Francis, but mentioned that they were looking for "someone." Mr. Dixon and his two fellow passengers are all much older than Mr. Francis, and do not resemble Mr. Francis. The only similarity is that they are Black men.

41.     Acting within his constitutional rights, Mr. Dixon refused to hand the police his identification card. Defendant Diberadin responded with physical threats, telling Plaintiff Dixon, "I'll smash your fucking face in this car and get what I want, and nothing is going to happen to me." Defendant Diberadin also threatened to tow Mr. Dixon's car and then asked to search the car.

42.     Mr. Dixon, again exercising his constitutional rights, denied consent to the search. Nevertheless, Defendant Diberadin and the other officer present searched Mr. Dixon's car without his consent and without any probable cause to believe they would find evidence of a crime.

43.     Defendant Diberadin and the accompanying John Doe defendant conducted a pat-down search of Mr. Dixon over his objection. Then, Defendant Diberadin located Mr. Dixon's identification card inside one of the left front pockets of Mr. Dixon's jeans and tried to remove it by forcing his hand into Mr. Dixon's pocket, again over Mr. Dixon's objection.

44.     Mr. Dixon, caught off guard by the physical intrusion, backed up and asked what Defendant Diberadin was looking for. Defendant Diberadin did not respond, but did try to go into Mr. Dixon's pocket again. Mr. Dixon then reached into his pocket, pulled out his identification card, and handed it to Defendant Diberadin. Mr. Dixon did not want to give the officer his

identification card, but Defendant Diberadin's disregard for privacy, invasive tactics, aggression, and the imbalance of power in the situation led Mr. Dixon to believe that giving Defendant Diberadin his identification card was the only option that would result in him being *able* to go home. Mr. Dixon feared that if he did not submit to Defendant Diberadin, he could be unlawfully arrested, beaten, or worse.

45.     After the officer took Mr. Dixon's identification card, Defendant Diberadin looked at it. Defendant Diberadin took the card to his police vehicle and, after a short amount of time, told Mr. Dixon that he had outstanding warrants. Mr. Dixon contested this claim, believing he had handled all previous legal action against him.

46.     During all of this, a third police officer John Doe defendant arrived, whom Mr. Dixon believed to be a superior officer because he was wearing a white shirt and was treated as though he was in charge by Defendant Diberadin and the other John Doe defendant who initially pulled him over. The superior officer was in possession of Mr. Dixon's identification card after Defendant Diberadin said Mr. Dixon had outstanding warrants. While examining Mr. Dixon's identification card, the superior officer took out what Mr. Dixon described as a "cell phone type thing" and appeared to look up whether Mr. Dixon had any outstanding warrants.

47.     The John Doe defendant officer acknowledged that Mr. Dixon did not have any outstanding warrants. Eventually, the three law enforcement officers allowed Mr. Dixon and his two fellow passengers to drive away after finding no evidence of any crime in their suspicion-less, warrantless, lawless search.

48.     Police Defendants then followed Mr. Dixon and his friends as they drove to the home in which Mr. Dixon resided at the time of the events described herein, which is now his former residence. Police Defendants parked in front of an empty lot that was diagonal from Mr.

12

Dixon's home. Upon arriving at home, Mr. Dixon and his fellow passengers stayed in the car because they were afraid Police Defendants may hurt them or get them in trouble. Eventually, Mr. Dixon and his fellow passengers went inside Mr. Dixon's home, but the episode left Mr. Dixon fearful of McKeesport-area police officers.

49.     At no point did any police officer present Mr. Dixon with a search warrant, and the police had no probable cause to suspect that they would find any evidence connected to Mr. Francis, or any crime, in Mr. Dixon's car.

50.     **Kim Neal** is a Black resident of McKeesport and Koby Lee Francis's mother. She and her family were subject to a series of abusive searches in the days following December 20, 2020.

51.     During her first encounter with the Police Defendants, officers surrounded Ms. Neal's home at night and knocked on the front door of the home where Ms. Neal lived with her husband (Gregory Neal) and their son (Gregory Neal Jr., 19 years old at the time). Ms. Neal saw police in tactical gear in her backyard, on the side of the house, around a neighbor's house, and across the street at another neighbor's house, many with guns trained on Ms. Neal's home. Due to the chaotic and unorthodox nature of police officers' arrival, Ms. Neal is not sure of the exact number of Police Defendants present. However, given the number of places officers were positioned, it is likely that around seven officers—including John and/or Jane Doe defendants—were present.

    a.  Upon information and belief, the officers present were a combination of McKeesport Police and Allegheny County Police.

    b.  The officers who approached Ms. Neal's home were accompanied by Defendant Brenda Sawyer, who was positioned in front of the group of officers.

Plaintiff Neal believed Defendant Sawyer, at the time, was a member of local law enforcement. Defendant Sawyer was not in a McKeesport Police uniform, but Ms. Neal recognized her based on Defendant Sawyer's community ties and her known status as a former McKeesport Police officer.

c.  By this time, Ms. Neal had heard about an incident involving Mr. Francis, her son. Ms. Neal later learned the police conducted a forceful warrantless raid at the home of her daughter, Tracey, where Police Defendants detained Tracey's husband and held four of Ms. Neal's grandchildren (all between the ages of 18 months and 7 years old at the time) outside in the cold winter night wearing nothing but diapers and underwear.

d.  Ms. Neal initially refused to let the police into her home without a warrant. At that point, Defendant Sawyer stepped slightly inside Ms. Neal's door before she could close it. Defendant Sawyer stated that the police did not need a warrant to search her home for Mr. Francis, but did not identify any exigency other than the fact that an officer had been shot.

e.  Based on Defendant Sawyer's misrepresentation that a warrant was not needed and out of fear for her life and the lives of her family because Police Defendants had guns drawn, Ms. Neal reluctantly submitted to the home search.

f.  Approximately five additional officers—including John and/or Jane Doe defendants—searched Ms. Neal's home for approximately a half hour while the other officers continued to surround the house with guns trained on Ms. Neal's home and family. They found no indication that Mr. Francis was present, or that any other crime had occurred on the premises.

52.     Over the ensuing days, Police Defendants placed Ms. Neal and her family under surveillance but never presented a search warrant or warrant for anyone's arrest. Ms. Neal, her younger son, Gregory Jr., and her daughter's family repeatedly were followed, questioned, and searched by the police.

53.     In another instance, Ms. Neal had been away from home and arrived around 8:00 p.m. to find police at her home.

    a.   Police Defendants blocked her from entering her home with guns drawn and pointed at Ms. Neal's family, claiming they "saw movement" in the house and demanded to be let in. Nobody had been in the house when the police claimed to have seen "movement," and Ms. Neal initially refused to let them in without a warrant.

    b.   Police Defendants continued to physically block Ms. Neal from entering her home, several of them continuing to point guns at Ms. Neal and her family, and threatened to arrest her if she tried to enter. Two John Doe defendant officers stood on Ms. Neal's front porch, and two other John Doe defendant officers were on the lower steps to the driveway.

    c.   Police Defendants stood outside Ms. Neal's home stopping her from entering for hours, all the while continuing to threaten her and trying to coerce Ms. Neal into letting them in. Ms. Neal repeatedly refused to permit officers to enter her home without a warrant.

    d.   At gunpoint, Ms. Neal's son, Gregory Jr., eventually provided Police Defendants with his house key at around 11:00 p.m. Neither Ms. Neal nor her

husband had consented to have their home searched, but she felt she did not have the option to stop them from entering with Gregory Jr.'s key.

    e.   Throughout the entirety of this episode, Police Defendants never presented a warrant; but, they kept their guns drawn throughout the search of Ms. Neal's home.

    f.   Ms. Neal estimates police officers were on her property for about three hours during this search. When the officers finished this search, Ms. Neal finally was allowed to go back inside her home. Police Defendants remained immediately outside Ms. Neal's home with a spotlight still shining through her windows for another 45 minutes to an hour, preventing her family from going to sleep.

54.    Ms. Neal and her family were also subject to repeated unwarranted traffic stops when she attempted to drive away from her house during the Police Defendants' manhunt for Mr. Francis that lasted through December 29, 2020.

55.    On one occasion during the December 2020 manhunt, Police Defendants pulled her over in the parking lot of a Giant Eagle store near her home, baselessly claiming that she had run a stop sign as a pretext to conduct the stop. Three or four police cars surrounded Ms. Neal's car for the alleged missed stop sign, though the police on the scene detained Ms. Neal in this instance for only a short time to request her license and registration before letting her drive away.

56.    On another occasion, Police Defendants were much more aggressive:

    a.   Several days after the search for Mr. Francis began, Ms. Neal was driving her car with her husband, Gregory, in the passenger seat and their son, Gregory Jr., in the back seat. Ms. Neal's niece was following in a separate car. When the cars stopped at a stop sign several blocks from the Neal home, Police

Defendants jumped from behind bushes, surrounded Ms. Neal's car, approached screaming with guns drawn, and pointed their guns at Ms. Neal's head.

b. Police Defendants told Ms. Neal to put her car in park and place her hands on her steering wheel. With guns pointed at her head, she submitted to the Police Defendants' requests.

c. When she placed her car in park, the doors automatically unlocked. Without Ms. Neal's consent, a John Doe defendant officer opened the backseat car door and forcefully yanked Gregory Jr., who is a noticeably different size, age, and complexion from Mr. Francis, out of the car. Without probable cause to believe that any crime had occurred, Police Defendants cuffed and detained Gregory Jr. without explanation while Ms. Neal yelled repeatedly, "That's not Koby" and "You have the wrong person."

d. With Gregory Jr. detained in cuffs and the rest of the family detained in cars, several Police Defendants pointed their guns into Ms. Neal's niece's car and looked inside.

e. Police Defendants eventually uncuffed Gregory Jr., and the family was able to leave without any charges or evidence of any crime being found. Though he was not charged with anything, Police Defendants unlawfully and unconstitutionally seized Ms. Neal and her family, leaving all of them traumatized, especially Gregory Jr.

57.    Ms. Neal's husband, who is white, was not pulled over at any point during the December 2020 manhunt, even though he was leaving the same house in his 12-passenger van

during the same time period. The Neals eventually decided to let Mr. Neal do the driving for the family to avoid being pulled over every time they left the house.

58.     At no point between December 20, 2020, and the day Mr. Francis was apprehended in West Virginia on December 29, 2020, did any police officer present Ms. Neal or anyone in her family with a search warrant or an arrest warrant for Mr. Francis. None of the searches or stops conducted during this time were supported by warrants or probable cause. Additionally, none of the searches or stops conducted were consensual because Police Defendants' often, excessive use of force made "consent" impossible.

59.     On information and belief, many other Black residents of McKeesport, not named as plaintiffs here, were similarly subjected to warrantless searches during the hunt for Mr. Francis, despite having no connection to Mr. Francis or knowledge of the manhunt.

60.     Plaintiffs allege, on information and belief, that the warrantless searches and racial bias alleged herein were part of a long-standing practice and custom of the Allegheny County and McKeesport Police Departments, and that the supervisor and policymaker Defendants—namely, officers Alfer, Steele, and McDonough—were not only deliberately indifferent, but that they directed, authorized, condoned, and encouraged the violations of citizens' Constitutional rights alleged herein and/or agreed to subordinates' decisions to engage in those violations, such that these violations were customary or represented a *de facto* policy within their respective police departments.

61.     The City of McKeesport and McKeesport Police Department, upon information and belief and as reflected in the conduct alleged above, provided inadequate training to Police Defendants and other officers under its supervision pertaining to the appropriate search tactics and shows and use of force to employ in given circumstances, prohibitions against illegal entries,

unlawful searches, and concerning when and how to intervene to stop unlawful conduct by fellow officers. Upon information and belief, no appropriate remedial training was provided for Police Defendants following the events described herein.

62.     Allegheny County and the Allegheny County Police Department, upon information and belief and as reflected in the conduct alleged above, provided inadequate training to Police Defendants and other officers under its supervision pertaining to the appropriate search tactics and shows and use of force to employ in given circumstances, prohibitions against illegal entries, unlawful searches, and concerning when and how to intervene to stop unlawful conduct by fellow officers. Upon information and belief, no appropriate remedial training was provided for Police Defendants following the events described herein.

63.     Upon information and belief, and as reflected in the conduct alleged above, the decision-makers associated with the Allegheny County and McKeesport Police Departments responsible for the search for Mr. Francis—including officers Alfer, Steele, and McDonough— made the deliberate choice to engage in racially biased and warrantless searches of Plaintiffs and others in and around McKeesport, and they directed officers under their supervision to carry out such racially biased and warrantless searches.

64.     The incidents in late December 2020 highlight the need for change in how McKeesport area law enforcement treat the community, especially the Black community. Plaintiffs are Black residents of McKeesport, whose rights are not given the same level of respect as the rights of white residents of McKeesport and Allegheny County. The appearance of uniformed officers swarming McKeesport neighborhoods with guns drawn and no warrants was later described by a McKeesport resident at a City Council meeting as like a "form of martial law[.]"

The Defendants must be held accountable for their unreasonable, unlawful, and unconstitutional actions.

65.     The events of December 2020 occurred against the background of a long history of strife and conflict between Allegheny County's Black communities and the forces that police them.[5]

66.     Black residents of McKeesport and neighboring communities in the Greater Pittsburgh Area have long endured abuses by police forces treading on basic constitutional rights, subjecting them to officers' whims and caprice. One resident stated during a McKeesport City Council meeting on April 7, 2021, that Defendants, who were "supposed to be the protectors and servants in [their] communities," were more akin to "terrorists who enter homes without explanation[,] leaving both adults and children distressed."[6] Other residents noted that Defendants, with the help of "10 Police Departments,"[7] "implement[ed] their own form of martial law on various Black Mon Valley communities."[8]

67.     Residents recognized the connection between Defendants "just going into people's homes" and what had recently "happened to Bryona [sic] Taylor" and other episodes of police brutality and killings of unarmed Black people.[9]

---

[5] *See*, *e.g.*, Press Release, Rep. Austin Davis et al., Lawmakers comment on acquittal of white police officer in fatal shooting of Antwon Rose (Mar. 23, 2019), *available at*
https://web.archive.org/web/20190330071748/https://www.pahouse.com/ADavis/InTheNews/NewsRelease/?id=105811 (joint statement by Pittsburgh-area lawmakers stating that "[o]ur region has a troubling history of racial injustices" in connection with police shootings and "police officers time and time again have used excessive, unnecessary force against African-American civilians and faced no criminal convictions for their actions").
[6] *Minutes of Regular Meeting of McKeesport City Council*, CITY OF MCKEESPORT 27 (Apr. 7, 2021), http://www.mckeesport-pa.gov/AgendaCenter/ViewFile/Minutes/_04072021-135 (comments by Liv Bennet).
[7] *Id*. at 3 (comments by Bonnie Fan).
[8] *Id*. at 28 (comments by Fawn Montgomery).
[9] *Id.* at 2-3 (comments by Kyna James of the Alliance for Police Accountability); *see also* Elie Mystal, *Breonna Taylor Was Murdered for Sleeping While Black*, NATION, (May 15, 2020), https://www.thenation.com/article/society/breonna-taylor-was-murdered-for-sleeping-while-black/.

68.     Moreover, 2020 Census data shows that while approximately 38% of Defendant City of McKeesport's almost 18,000 residents were Black,[10] 65% of the people the McKeesport Police Department arrested between 2013 and 2021 were Black.[11]

69.     The trend is seen throughout Allegheny County, where the other Police Defendants routinely operate. In Pittsburgh, for example, Black people made up 22.9% of the population in 2019;[12] but, in that same year, over 60% of people subject to use of force[13] by Pittsburgh police and 69% of individuals subject to warrantless searches and seizures[14] were Black. During the same period, Black people accounted for 43.6% of traffic stops by Pittsburgh police,[15] 71.4% of those subject to frisks,[16] and 63% of arrests.[17]

70.     The ACLU of Pennsylvania tried to obtain more information that directly pertains to Defendant City of McKeesport. In fact, the ACLU of Pennsylvania, after Defendant City of McKeesport closed its meetings to the public, filed a lawsuit and obtain a consent order allowing a local organization to gain access to the meetings.[18]

71.     While police officers undoubtedly confront challenging, dangerous, and even life-threatening situations in the line of duty, the search for a suspect does not give police a blank check to violate individuals' constitutional rights and target communities of color. Officers and others

---

[10] *QuickFacts for McKeesport City, Pennsylvania*, U.S. CENSUS BUREAU (accessed Nov. 14, 2023), https://www.census.gov/quickfacts/fact/table/mckeesportcitypennsylvania/POP010220#POP010220.
[11] *See McKeesport, PA*, Police Scorecard, (accessed Nov. 14, 2023), https://policescorecard.org/pa/police-department/mckeesport.
[12] *QuickFacts for Pittsburgh City, Pennsylvania*, U.S. CENSUS BUREAU (July 1, 2019), https://www.census.gov/quickfacts/fact/table/_2_pittsburghcitypennsylvania,PA/PST045219.
[13] CITY OF PITTSBURGH DEPT. OF PUB. SAFETY BUREAU OF POLICE, 2019 STATISTICAL REPORT 42 (May 29, 2020), *available at* https://apps.pittsburghpa.gov/redtail/images/ 1 9640_2019_Annual_Report_Final.pdf.; see also Use of Force in the City of Pittsburgh: 2015 through June 2020, City of Pittsburgh Bureau of Police (Mar. 2021), https://www.alleghenycountyanalytics.us/wp-content/uploads/2021/03/21-ACDHS-03_PoliceUOF_03152021.pdf.
[14] *Id*. at 38.
[15] *Id*. at 36.
[16] *Id*. at 37.
[17] *Id*. at 35.
[18] *See Walker-Montgomery v. McKeesport City Council*, G.D. No. 21-1723, (Pa. Com. Pl. Mar. 10, 2023).

acting under the color of state authority must respect the rights of individuals protected by the United States and Pennsylvania constitutions, as well as by other federal and state laws.

72.     The right to be free from unlawful and unreasonable searches and seizures is enshrined in the Fourth Amendment of the U.S. Constitution. Even before it became a foundation of American governance, it was a recognized fundamental liberty in our Commonwealth. Article I, Section 8 of the Pennsylvania Constitution protects "[t]he people" from "unreasonable searches and seizures" of "their persons, houses, papers and possessions."[19] This freedom under the Pennsylvania Constitution is stronger and holds a deeper history than its counterpart under the U.S. Constitution.

73.     The incidents in late December 2020 highlight the need for changes in how McKeesport area law enforcement treats community members, especially Black community members. Plaintiffs are Black residents of McKeesport, whose rights are not given the same level of respect as the rights of white residents of McKeesport and Allegheny County

### IV.     CLAIMS AGAINST DEFENDANTS

### COUNT I
**42 U.S.C. § 1983**
**Unreasonable Search and Seizure in Violation of the Fourth Amendment to U.S. Constitution**
*Against All Defendants*

74.     Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

75.     Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.

---

[19] PA. CONST. Art I § 8.

76.     Warrantless searches presumptively are unreasonable under the Fourth Amendment.

77.     By their conduct, as described herein, and acting under color of state law to deprive the Plaintiffs of their right to be free from unreasonable searches and seizures without reasonable suspicion or probable cause as required by the Fourth Amendment, Defendants are liable for violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

78.     Defendants subjected Ms. Thompkins and Ms. Neal to unlawful and invalid searches when Defendants conducted and facilitated searches of their homes without search warrants, probable cause, or even reasonable and particularized suspicion.

79.     Neither Ms. Thompkins nor Ms. Neal freely consented to Defendants' searches of their homes; instead, Ms. Thompkins and Ms. Neal submitted to Defendants' show of force when the choice seemed to be between having their homes searched or their lives taken. Defendants' show of force in drawing their guns made Ms. Thompkins and Ms. Neal believe that they had no choice as to whether their homes would be searched. Plaintiff Thompkins and Plaintiff Neal believed any resistance would not stop the search, and it would only increase their risk of harm.

80.     Mr. Dixon and Ms. Neal were subjected to unlawful and invalid searches and seizures when Defendants stopped and searched their cars without search warrants, probable cause, or even reasonable and particularized suspicion.

81.     Mr. Dixon and Ms. Neal did not freely consent when Defendants stopped and searched their cars. Mr. Dixon and Ms. Neal believed any resistance would not stop the search, and it would only increase their risk of harm.

82.   Defendants' conduct in relation to the aforementioned searches and seizures was intentional.

83.   At all times, Defendants acted under color of state law.

84.   No exigent circumstances apply such that the aforementioned warrantless searches, for which consent was not freely given and for which Defendants did not have reasonable suspicion or probable cause, are justified under the Fourth Amendment.

85.   As a direct and proximate result of Defendants' violation of Plaintiffs' constitutional rights, Plaintiffs have been injured and suffered damages.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

## COUNT II
### Violation of Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania
#### *Against All Defendants*

86.   Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

87.   Defendants' conduct violated Plaintiffs' rights under Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania.

88.   As a result of Defendants' conduct, the guarantee afforded to Plaintiffs under Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures, without search warrants or probable cause, was violated.

89.     Ms. Thompkins and Ms. Neal were subjected to unlawful and invalid searches when Defendants conducted and facilitated searches of their homes without search warrants, probable cause, or even reasonable and particularized suspicion.

90.     Neither Ms. Thompkins nor Ms. Neal ever freely consented to allow Defendants to conduct or facilitate searches of their homes. Ms. Thompkins and Ms. Neal believed any resistance would not stop the search, and it would only increase their risk of harm.

91.     Defendants subjected Mr. Dixon and Ms. Neal to unlawful and invalid searches and seizures when Defendants stopped and searched their cars without reasonable or individualized suspicion, probable cause, or search warrants.

92.     Neither Ms. Neal nor Mr. Dixon ever freely consented to allow Defendants to stop or search their cars. Plaintiffs believed any resistance would not stop the search, and it would only increase their risk of harm.

93.     Defendants' conduct in relation to the aforementioned searches and seizures was intentional.

94.     At all times, Defendants acted under color of state law.

95.     No exigent circumstances apply such that the aforementioned warrantless searches, for which consent was not freely given and for which Defendants did not have reasonable suspicion or probable cause, are justified under Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania.

96.     As a direct and proximate result of Defendants' conduct in relation to the aforementioned searches and seizures, Plaintiffs' constitutional rights were violated, and Plaintiffs believe and therefore allege that they are at continuing risk to suffer the identical harms by these Defendants in the event that intervention by this Court does not occur.

**WHEREFORE**, Plaintiffs request judgment against Defendants in the form of declaratory and injunctive relief, and such other relief as the Court deems just, proper, and equitable.

**COUNT III**
**42 U.S.C. § 1983**
**Excessive Force**
*Against All Defendants*

97.     Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

98.     By their conduct, as described herein, and acting under color of state law to deprive the Plaintiffs of their right to be free from the needless and unreasonable use of excessive force as required by the Fourth Amendment, Defendants are liable for violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

99.     In the course of the aforementioned searches and seizures of Plaintiffs, Defendants' application and/or threats of force against Plaintiffs was unreasonable under the circumstances and unconstitutionally excessive.

100.    Plaintiffs were subjected to seizures within the meaning of the Fourth Amendment through the application of force.

101.    Defendants used excessive force and threats of excessive force in the searches and seizures of Plaintiffs in that there was absolutely no need for the application of any force, and in view of the fact that the amount of force actually used by Defendants exceeded the amount of force that a reasonable officer would have used under similar circumstances.

102.    No physical force of any kind was required or should have been employed against Plaintiffs here.

103.    Plaintiffs did not present any threat to Defendants nor to any other persons or property in their encounters with Defendants in which excessive force was used.

104.    Defendants used excessive force in their encounter with Ms. Thompkins when more than ten police officers came to Ms. Thompkins's house in tactical gear, surrounded the house, and pointed guns at her in order to overcome her objections to search and gain entry to her home.

105.    Defendants used excessive force and unreasonable threats of force in their encounter with Mr. Dixon, including by forcing their way into Mr. Dixon's pocket without consent and by saying something to the effect of "I'll smash your fucking face in this car and get what I want, and nothing is going to happen to me" when Mr. Dixon declined to give his ID to the police officer or give his consent to the police to search his car.

106.    Defendants used excessive force in their encounter with Ms. Neal when police pointed guns at her head in order to overcome her objections to search and gain entry to her home, and then kept their guns drawn throughout the search of Ms. Neal's home.

107.    Defendants also used excessive force in a separate encounter with Ms. Neal when police jumped from the bushes and surrounded Ms. Neal's car at an intersection, approached screaming with guns drawn, trained their guns on Ms. Neal's face during a car stop, and forced Ms. Neal's younger son out of the car and cuffed and detained him without explanation.

108.    Defendants' use of force in the aforementioned encounters was not reasonable under the United States Constitution because there was no need for any force, especially the force that was used.

109.    The nature and degree of excessiveness used against Plaintiffs by Defendants was intentional.

110.    At all times, Defendants acted under color of state law.

111.    As a direct and proximate result of Defendants' violation of Plaintiffs' constitutional rights, Plaintiffs have been injured and suffered damages.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

<u>**COUNT IV**</u>
**Violation of Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania**
**and the Fourth Amendment of the U.S. Constitution**
**Excessive Force**
***Plaintiffs Neal and Thompkins Against All Defendants***

112.    Ms. Neal and Ms. Thompkins incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

113.    By their conduct, as described herein, and acting pursuant to their official duties, Police Defendants used excessive force when they drew their guns and pointed them at Ms. Thompkins and Ms. Neal while conducting illegal, warrantless searches in violation of well-established Fourth Amendment jurisprudence, which clearly states that it is a constitutional violation for law enforcement officers to point a gun at an individual who does not pose a reasonable threat of danger or violence to the law enforcement officer.

114.    Ms. Thompkins and Ms. Neal were subjected to seizures within the meaning of the Fourth Amendment through the application of force, and their constitutional right to be free from excessive force was violated.

115.    In the course of the aforementioned searches and seizures of Ms. Thompkins and Ms. Neal, Police Defendants' acts of brandishing their weapons constitutes an application of force against Ms. Thompkins and Ms. Neal that was unnecessary and excessive, and is plainly unreasonable under the circumstances.

116.     Police Defendants' use of force during the illegal, warrantless searches and seizures was unnecessary and excessive, exceeding the amount of force that a reasonable peace officer would use under similar circumstances.

117.     Accordingly, Police Defendants' violated Plaintiff Thompkins and Plaintiff Neal's Fourth Amendment right to be free from excessive force.

118.     No deadly demonstration of force or authority of any kind was required or should have been employed against Plaintiff Thompkins and Plaintiff Neal.

119.     Police Defendants used excessive force in their encounter with Ms. Thompkins when more than ten police officers came to Ms. Thompkins's house in tactical gear, surrounded the house, and pointed guns at her. Ms. Thompkins was alone and did not pose a threat to the officers when she attempted to walk out of the front door of her own home.

120.     Police Defendants used excessive force in their encounter with Ms. Neal when police pointed guns at her head before conducting an illegal, warrantless search of her home. After Ms. Neal reluctantly acquiesced to the search, without displaying or exhibiting any threatening behavior, Defendants kept their firearms out while they searched Ms. Neal's home. Led by Defendant Sawyer, approximately five law enforcement officers, all of whom are Defendants in this lawsuit, searched Ms. Neal's home while she, her husband, and her younger son, Gregory, were home.

121.     Police Defendants in the course of attempting to search her home, kept their guns out throughout the search of Ms. Neal's home.

122.     Police Defendants used excessive force in a separate encounter with Ms. Neal when Defendants jumped from the bushes and surrounded Ms. Neal's car at an intersection. Police Defendants approached Ms. Neal's car with their guns drawn and pointed at Ms. Neal's face.

Police Defendants were screaming as they approached Ms. Neal's car and continued to scream throughout the car stop. During the stop, Police Defendants also forced Ms. Neal's younger son, Gregory, out of the car, cuffed him, and detained him without explanation.

123.   Police Defendants did not communicate suspicion, nor could they have reasonably suspected either Ms. Thompkins or Ms. Neal, or individuals in their company, of committing any crimes, let alone a crime that could justify the force Police Defendants displayed.

124.   Neither Ms. Thompkins nor Ms. Neal displayed or exhibited threatening behavior towards Police Defendants or any other persons or property during their encounters with Police Defendants in which excessive force was used.

125.   Neither Ms. Thompkins nor Ms. Neal nor the individuals in their company used illegal or unlawful means to resist Police Defendants' illegal warrantless searches or flee the scene.

126.   Neither Ms. Thompkins nor Ms. Neal nor the individuals in their company were violent or dangerous.

127.   Defendants' use of force in the aforementioned encounters was not reasonable under the Constitution because there was no need for any force, especially the deadly force that was used.

128.   The nature and degree of excessiveness used against Ms. Thompkins and Ms. Neal by Defendants was intentional, unreasonable, unnecessary, excessive, and unconstitutional.

129.   At all times, Defendants acted pursuant to their official duties and within their official capacity, under color of state law.

130.   As a direct and proximate result of Defendants' violation of Ms. Thompkins's and Ms. Neal's constitutional rights, Plaintiffs have been injured and suffered damages.

**WHEREFORE**, Ms. Thompkins and Ms. Neal request judgment against Defendants: jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable (for violation of the Fourth Amendment of the U.S. Constitution); and in the form of declaratory and injunctive relief, and such other relief as the Court deems just, proper, and equitable (for violation of Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania).

### COUNT V
**42 U.S.C. § 1983**
**Racial Discrimination in Violation of the Equal Protection Clause**
***Against All Defendants***

131.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

132.    At all times relevant and material hereto, Defendants were acting under the color of state law.

133.    Plaintiffs, as Black individuals, are members of a protected class, and have the right to be free from racial discrimination and/or racial profiling under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

134.    Plaintiffs' race was a motivating factor in Defendants' decision to target Plaintiffs for unreasonable and unjustified searches and seizures and subject them to excessive force in the course of such searches and seizures, as described more fully above.

135.    Defendants treated white residents of the same McKeesport neighborhoods—some of whom had connections to Koby Lee Francis—much less harshly than they treated Plaintiffs, and did not target them for searches and seizures or subject them to excessive force.

136.    Plaintiffs were improperly subjected to unreasonable and unjustified searches and seizures and subjected to excessive force due to their race and/or membership in a protected class.

31

137.     Defendants' conduct was undertaken with the purpose of depriving Plaintiffs of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Equal Protection Clause of the Fourteenth Amendment.

138.      At all times relevant to the above-described events, Plaintiffs had the clearly established constitutional right to be free from racial discrimination and/or racial profiling in law enforcement by police officers and to enjoy the equal protection of the laws.

139.     Any reasonably well-trained police officer knew or should have known of these rights at the time of the complained-of conduct, as they were clearly established, and that the conduct described herein violated these clearly established rights.

140.     Defendant's actions intentionally deprived Plaintiffs of these clearly established constitutional rights and protections.

141.     Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiffs' constitutionally protected rights.

142.     At all times, Defendants acted under the color of state law.

143.     As a direct and proximate result of Defendants' violation of Plaintiffs' constitutional rights, Plaintiffs have been injured and suffered damages.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

## COUNT VI
### 42 U.S.C. § 2000d
**Racial Discrimination in Violation of the Title VI of the Civil Rights Act of 1964**
*Against City of McKeesport and Allegheny County, and Defendants Alfer,*
*McDonough, and Steele in Their Official Capacities*

144.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

145.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) et seq., prohibits discrimination based on race in any program or activity receiving federal financial assistance.

146.     In pertinent part, Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

147.    Upon information and belief, Defendants received federal financial assistance from the Department of Justice; the American Rescue Act; and the Coronavirus Aid, Relief, and Economic Security (CARES) Act.

148.    Plaintiffs, like all City of McKeesport and Allegheny County residents, are the intended beneficiaries of the federal financial assistance provided to Defendants.

149.    Plaintiffs are all Black people and are thus members of a protected class.

150.    Defendants, through policy, practice, custom, and/or the direction of policymaking supervising and managing personnel, discriminated against Plaintiffs on the basis of race, color, and/or national origin in violation of Title VI, including through their selective deployment of force and unlawful searches and seizures during December 2020, as described more fully above.

151.    Defendants' manhunt for Mr. Francis was carried out pursuant to a policy, practice, custom, and/or the direction of policymaking superior and managing personnel that was designed

to discriminate against Plaintiffs and other Black McKeesport residents on the basis of the race, color, and/or national origin.

152.    Defendants' manhunt for Mr. Francis included, but was not limited to, carrying out the following discriminatory practices:

        a.   Improperly targeting Ms. Thompkins and Ms. Neal in subjecting them to constitutionally invalid and unreasonable searches when Police Defendants conducted and facilitated unlawful, warrantless searches of their homes;

        b.   Improperly targeting Mr. Dixon in subjecting him to an unjustified and unreasonable search and seizure of his car;

        c.   Improperly subjecting Plaintiffs to constitutionally invalid and unreasonable seizures within the meaning of the Fourth Amendment through the application of force and threatened force;

        d.   Racially profiling Plaintiffs, their families, and other Black McKeesport residents throughout the search for Mr. Francis; and

        e.   Giving preferential treatment to white McKeesport residents who had closer connections to Mr. Francis, like Ms. Neal's husband, Gregory Neal, and Ms. Thompkins's neighbor.

153.    Plaintiffs' race was a motivating factor in Defendants' decision to target Plaintiffs for unreasonable and unjustified searches and seizures and subject them to excessive force in the course of such searches and seizures.

154.    Defendants' unlawful and adverse actions towards Plaintiffs were the result of longstanding policy, customs, and/or practices.

155.    Police Defendants treated white McKeesport residents who lived in the same neighborhoods less harshly than they treated Plaintiffs. Despite the fact that white McKeesport residents had close connections to Mr. Francis, Police Defendants did not target white McKeesport residents for constitutionally invalid and unreasonable searches and seizures.

156.    Defendants knew or should have known of the substantial risk for discrimination, harassment, and intimidation Plaintiffs suffered, and failed to take appropriate remedial action.

157.    Defendants knew or should have known that Plaintiffs federally protected rights were substantially at risk of being infringed, and failed to take appropriate remedial action.

158.     At all times, Defendants acted pursuant to their official duties and within their official capacity, or as agents of law enforcement officials acting within their official capacity, under color of state law.

159.    As a result of the egregious racist conduct of Defendants, Plaintiffs' rights have been violated and Plaintiffs have been injured and suffered damages.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

## COUNT VII
### 42 U.S.C. § 1983
### Civil Conspiracy to Violate Plaintiffs' Rights Under the Fourth Amendment to the United States Constitution
### *Against All Defendants and Does*

160.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

161.    Defendants participated in a conspiracy to violate Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

162.    Direct evidence of conspiracy is rarely available and, therefore, the existence of a conspiracy must usually be inferred from the circumstances.

163.    The circumstances establishing a conspiracy here are compelling:

    a.    Individual Defendants were present and jointly committed unconstitutional searches and seizures upon Plaintiffs, and not one of them cautioned, restrained, or prevented the others from engaging in this wrongdoing, even though the opportunity clearly existed to do so, and even though the obligation to do so existed;

    b.    The act of placing Defendant Sawyer in a lead position with officers of the McKeesport and Allegheny County Police Departments to interact with targeted citizens, upon information and belief to act on behalf of the police forces, shows an agreement among all Defendants to gain entry into Plaintiffs' homes without warrants and without freely given consent; and,

    c.    Defendants acted fully in concert with each other, demonstrating the common plan, scheme, or design that they agreed upon, and a meeting of the minds when the unlawful encounters occurred.

164.    Each one of the foregoing intentional acts or omissions evinces a meeting of the minds and an understanding amongst Defendants, which had as their successful object the deprivation of the right to be free from unreasonable searches and seizures without reasonable suspicion or probable cause as required by the Fourth Amendment of the United States Constitution.

165. It is also clear from the foregoing that Defendants together:

    a. Engaged in a single plan, the essential nature and general scope of which was known by them;

    b. Executed that plan in a coordinated way and by a common design, which had as its probable and natural consequences the violation of Plaintiffs' constitutional rights as set forth herein;

    c. Acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an agreement between them to inflict a wrong against, or injury upon, Plaintiffs as more fully set forth herein; and,

    d. As a direct and proximate result of the foregoing, and the overt acts described hereinbefore, Plaintiffs suffered the damages enumerated.

166. This conspiracy, as it applied to the Plaintiffs, was an express or implied agreement amongst Defendants to deprive the Plaintiffs of their constitutional rights, inter alia, the rights to due process and to be free from excessive use of force and unlawful search and seizure.

167. Defendants voluntarily participated in the common venture, understood the general objectives of the plan, knew it was likely to deprive Plaintiffs of their constitutional rights, accepted those general objectives, and then agreed, either explicitly or implicitly through action, to further those objectives.

168. Defendants either acted or, where they possessed a duty to act, refrained from acting in a manner intended to facilitate the deprivation of Plaintiffs' constitutional rights.

169. At all times, Defendants acted under color of state law.

170.    An actual deprivation of those rights did occur to Plaintiffs resulting from said agreement or common design, and as a foreseeable consequence thereof.

171.    Defendants are jointly and severally responsible for the injuries caused by their fellow co-conspirators even if, or when, their own personal acts or omission did not proximately contribute to the injuries or other harms that resulted.

172.    As a result of the civil conspiracy entered into and acted upon by Defendants, Plaintiffs suffered a deprivation of their constitutional rights, and suffered damages as stated herein.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

### COUNT VIII
**Civil Conspiracy to Violate Plaintiffs' Rights Under Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania and the Fourth Amendment to the United States Constitution**
***Against All Defendants***

173.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

174.    Defendants participated in a conspiracy to violate Plaintiffs' rights under the Fourth Amendment to the United States Constitution and section 8 of the Constitution of the Commonwealth of Pennsylvania in violation of Pennsylvania law.

175.    Direct evidence of conspiracy is rarely available and, therefore, the existence of a conspiracy must usually be inferred from the circumstances.

176.    The circumstances establishing a conspiracy here are compelling:

a.  Individual Defendants were present and jointly committed unconstitutional searches and seizures upon Plaintiffs, and not one of them cautioned, restrained, or prevented the others from engaging in this wrongdoing, even though the opportunity clearly existed to do so, and even though the obligation to do so existed;

b.  The act of placing Defendant Sawyer in a lead position with officers of the McKeesport and Allegheny County Police Departments to interact with targeted citizens, upon information and belief to act on behalf of the police forces, shows an agreement among all Defendants to gain entry into Plaintiffs' homes without warrants and without freely given consent; and

c.  Defendants acted fully in concert with each other, demonstrating the common plan, scheme, or design that they agreed upon, and a meeting of the minds when the unlawful encounters occurred.

177.  Each one of the foregoing intentional acts or omissions evinces a meeting of the minds and an understanding amongst Defendants, which had as their successful object the deprivation of the right to be free from unreasonable searches and seizures without reasonable suspicion or probable cause as required by the Fourth Amendment of the United States Constitution and article I, section 8 of the Constitution of the Commonwealth of Pennsylvania.

178.  It is also clear from the foregoing that Defendants together:

a.  Engaged in a single plan, the essential nature and general scope of which was known by them;

b.   Executed that plan in a coordinated way and by a common design, which had as its probable and natural consequences the violation of Plaintiffs' constitutional rights as set forth herein;

c.   Acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an agreement between them to inflict a wrong against, or injury upon, Plaintiffs as more fully set forth herein; and

d.   As a direct and proximate result of the foregoing, and the overt acts described hereinbefore, Plaintiffs suffered the damages enumerated.

179.   This conspiracy was an express or implied agreement amongst Defendants to deprive the Plaintiffs of their federal and state constitutional rights, inter alia, the rights to due process and to be free from excessive use of force and unlawful search and seizure.

180.   Defendants voluntarily participated in the conspiracy, understood the general objectives of the plan, knew it was likely to deprive Plaintiffs of their constitutional rights, accepted those general objectives, and then agreed, either explicitly or implicitly through action, to further those objectives.

181.   Defendants either acted or, where they possessed a duty to act, refrained from acting in a manner intended to facilitate the deprivation of Plaintiffs' constitutional rights.

182.   At all times, Defendants acted under color of state law.

183.   An actual deprivation of those rights did occur to Plaintiffs resulting from said agreement or common design, and as a foreseeable consequence thereof.

184.    Defendants are jointly and severally responsible for the injuries caused by their fellow co-conspirators even if, or when, their own personal acts or omission did not proximately contribute to the injuries or other harms that resulted.

185.    As a result of the civil conspiracy entered into and acted upon by Defendants, Plaintiffs suffered a deprivation of their constitutional rights, and suffered damages as stated herein.

**WHEREFORE**, Plaintiffs request judgment against Defendants: jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable (for violation of the Fourth Amendment of the U.S. Constitution); and in the form of declaratory and injunctive relief, and such other relief as the Court deems just, proper, and equitable (for violation of Article I, Section 8 of the Constitution of the Commonwealth of Pennsylvania).

<u>**COUNT IX**</u>
**Intentional Infliction of Emotional Distress**
***Against All Defendants***

186.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

187.    Defendants acted in an extreme and outrageous manner when they intentionally subjected Plaintiffs to the unlawful and invalid searches and seizures of their homes and vehicles without reasonable suspicion, probable cause, search warrants, or freely given consent.

188.    Defendants' behavior goes well beyond what an ordinary person would consider extreme and outrageous, including, but not limited to, using violence, intimidation, and unwarranted force while searching Plaintiffs, all of whom are Black, without any probable cause or individualized suspicion, pointing guns at Plaintiffs, and making statements along the lines of

"I'll smash your fucking face in this car and get what I want, and nothing is going to happen to me."

189.    Defendants acted with intent and malice and caused Plaintiffs significant and irreparable emotional harm.

190.    Defendants' actions as alleged herein were made with a tortious intent for the purpose of inflicting upon the Plaintiffs severe and acute emotional distress.

191.    Defendants' actions were done with the intent to harm and harass the Plaintiffs and with a reckless disregard of the Plaintiffs' rights, and therefore entitle the Plaintiffs to receive punitive or exemplary damages in an amount to be determined at a trial upon the issues.

192.    The aforementioned intentional and wanton acts of Defendants have in fact caused Plaintiffs severe emotional distress.

193.    As a direct result of Defendants' actions, Plaintiffs have suffered, and continue to suffer, extreme emotional suffering including, without limitation, sleeplessness, anxiety, depression, embarrassment, humiliation, and loss of the enjoyment of life's pleasures.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.

**COUNT X**
**42 U.S.C. § 1983**
**Municipal Liability**
***Against the City of McKeesport and Allegheny County***

194.    Plaintiffs incorporate by reference the allegations contained in the above-stated paragraphs as though fully set forth herein.

195.    Prior to December 2020, Defendants City of McKeesport and Allegheny County either failed to develop policies or, developed and maintained policies and/or customs exhibiting

deliberate indifference to the Constitutional rights of persons in McKeesport and Allegheny County, which caused the aforesaid violations of Plaintiffs' Constitutional rights.

196.    Defendants City of McKeesport and Allegheny County, by and through their responsible decision-makers and policy-makers, including officers Alfer, Steele, and McDonough, directly participated in the unlawful conduct alleged herein and/or directed, authorized, and condoned their subordinates' decisions to carry out such unlawful conduct.

197.    The violations of Plaintiffs' Constitutional rights, Plaintiffs' damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendants City of McKeesport and Allegheny County, which has encouraged, tolerated, ratified, and has been deliberately indifferent to, inter alia, the unlawful conduct, policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of the use of force by police officers and the proper exercise of police powers, including, but not limited to the making of an arrest, proper search and seizure, and the use of force.

198.    It was the policy, custom, and/or practice of the Defendants City of McKeesport and Allegheny County to allow racially biased searches, warrantless searches and the excessive use of force by its officers.

199.    The above described deficient policies and customs, and the failure to enforce, modify, terminate and/or adopt necessary and appropriate policies, practices, and procedures, demonstrates a deliberate indifference on the part of the policymakers of the Defendants City of McKeesport and Allegheny County, and has continued to serve as the moving force behind, and the cause of, the violations of the Plaintiffs' rights as alleged herein, as well as the claimed damages which resulted therefrom.

200.   But for this deliberate indifference, the injuries, which were suffered by the Plaintiffs, would, in all likelihood, not have occurred.

**WHEREFORE**, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages and for punitive damages, plus costs of this action, attorneys' fees, and such other relief as the Court deems just, proper, and equitable.


Dated: March 15, 2024                    Respectfully submitted,

                                         By: */s/ Stephen A. Loney, Jr.*
                                             ACLU OF PENNSYLVANIA
                                             Stephen A. Loney, Jr., Esq.
                                             PA I.D. No. 202535
                                             Solomon Furious Worlds, Esq.
                                             PA I.D. No. 333677
                                             P.O. Box 60173
                                             Philadelphia, PA 19102
                                             Email: sloney@aclupa.org
                                             Email: sfworlds@aclupa.org

                                             Richard T. Ting, Esq.
                                             PA I.D. No. 200438
                                             P.O. Box 23058
                                             Pittsburgh, PA 15222
                                             Email: rting@aclupa.org

                                             */s/ William J. Sheridan*

                                             REED SMITH LLP
                                             Firm I.D. #234
                                             William J. Sheridan, Esquire
                                             PA I.D. No. 206718
                                             Courtney B. Averbach, Esquire
                                             PA I.D. No. 318726
                                             Caitlyn M. Holsopple, Esquire
                                             PA I.D. No. 333161, *Pro Hac Vice Forthcoming*

                                             Reed Smith Centre
                                             225 Fifth Avenue, Suite 1200
                                             Pittsburgh, PA 15222
                                             Telephone: 412.288.3131

Facsimile: 412.288.3063
Email: wsheridan@reedsmith.com,
caverbach@reedsmith.com,
cholsopple@reedsmith.com

*Counsel for Plaintiffs*