**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

COURTNEY THOMPKINS, et al.,     )
                                      )
        Plaintiffs,          )
                                      )   2:24-cv-00008
              v.               )
                                      )
MCKEESPORT POLICE DEPARTMENT,   )
et al.,                               )
                                      )
        Defendants.       )

<u>**OPINION**</u>

**Mark R. Hornak, Chief United States District Judge**

This case focuses on events alleged to have occurred in the City of McKeesport,

Pennsylvania, over several days in December 2020, when law enforcement was seeking to

apprehend one or more individuals who they believed were involved in the shooting of a police

officer.

The Plaintiffs have already once amended their Complaint, and the First Amended

Complaint ("FAC"), ECF No. 21, is the operative pleading from their side of the caption. The

Defendants are various law enforcement agencies and adjacent individuals: the City of

McKeesport and its Police Department; several individuals who held positions with the

Department at the time of the events in question ranging from Chief to Patrol Officer; Allegheny

County (PA), where McKeesport is situated, and its police department, and the then-

Superintendent of the Allegheny County Police Department ("ACPD"); a former McKeesport

Police Officer who had moved on to the Office of the Pennsylvania Attorney General; and an

array of unnamed "John Doe" and "Jane Doe" Defendants.

All named Defendants have filed some sort of Motion pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss claims for improper service and failure to state a claim. (ECF Nos. 27, 29, 31, 33.) Several defendants also move to strike certain material they say is irrelevant or prejudicial from the FAC. (ECF No. 27.) The Motions are all briefed, both in support and in opposition. (ECF Nos. 28, 30, 32, 34, 38.) The matters are therefore ripe for disposition.

## I.     Factual Background[1]

On December 20, 2020, the McKeesport Police sought to arrest Koby Lee Francis. Mr. Francis allegedly shot a police officer and fled the scene. The Plaintiffs in this case allege that in the course of the search for Mr. Francis, various McKeesport and Allegheny County police officers violated their constitutional rights in several different ways.

Courtney Thompkins is a Black resident of McKeesport. On December 20, 2020, her domestic partner was stopped in his car near their home by police officers who displayed their guns. When Ms. Thompkins opened her front door, she was allegedly confronted by police in tactical gear with guns out, who allegedly demanded to enter her home. Four police officers, out of more than ten alleged to be surrounding her home, entered and searched the home. The officers allegedly continued to train their weapons on Ms. Thompkins until she brought that fact up with a superior officer who directed them to lower their guns. Ms. Thompkins says she was not presented with a search warrant and did not know why the police wanted to search her home. Ms. Thompkins' partner was detained by Brenda Sawyer, who was apparently well known as the first Black female police officer in McKeesport but was no longer on the force. Ms. Sawyer eventually told Ms. Thompkins' partner that he was free to leave but could not go back in the home, and then Ms. Sawyer entered the home. Ms. Thompkins alleges she has a white neighbor

---

[1] These facts are taken from the First Amended Complaint. (ECF No. 21.). For these purposes, the Court is obligated to treat them as accurate so long as they are plausible.

with a closer connection to the suspect whose home was not searched in the same manner as Ms. Thompkins' home was.

Ezra Dixon is also a Black resident of McKeesport. Mr. Dixon was driving on December 20, 2020, and turned his car to avoid the traffic resulting from a police roadblock. A police car pulled him over and officers asked to search the car. One of the police officers, Dante Diberadin, alleged that he smelled cannabis and asked Mr. Dixon and his passengers for identification. Mr. Dixon refused to provide identification and refused to consent to a search of the car. Mr. Diberadin allegedly said, "I'll smash your fucking face in this car and get what I want, and nothing is going to happen to me." Mr. Diberadin and another officer then searched the car and conducted a pat-down search of Mr. Dixon. Mr. Dixon then provided his identification, apparently because he felt it was the only way to conclude the interaction. A superior police officer looked up Mr. Dixon's identification after Mr. Diberadin claimed Mr. Dixon had outstanding warrants. When the police found no outstanding warrants, Mr. Dixon and his passengers were allowed to leave the scene of the stop. The involved police officers allegedly followed their car to Mr. Dixon's home.

Kim Neal is also a Black resident of McKeesport. She is Mr. Francis' mother. In the days following the shooting, at least seven officers from the McKeesport and Allegheny County Police allegedly surrounded her house and several trained guns on the home. Ms. Neal refused to consent to a search of her home. Ms. Sawyer stepped slightly inside the door of Ms. Neal's home and said the police did not need a warrant to search the house. Allegedly believing that Ms. Sawyer was still a local police officer, and because she was told that a warrant was unnecessary and she was afraid given the guns and police presence, Ms. Neal allowed the search. During that time, several officers stayed outside and kept their guns trained on Ms. Neal.

3

In the next few days, Ms. Neal and her family were followed, questioned, and searched by police, but never shown a search warrant or a warrant for their arrest. Ms. Neal alleges that there were a number of baseless traffic stops, including one where police jumped out from behind bushes, surrounded the cars, "approached screaming with guns drawn" and pointed their guns at her head. Police officers allegedly yanked her young son from her car, then cuffed and detained him while Ms. Neal yelled "That's not Koby [Francis]" and "You have the wrong person." They then pointed their guns into the car and looked inside. The Neals were ultimately allowed to leave without the police finding anything of interest. Ms. Neal's husband, who is white, was allegedly not pulled over at any time during the manhunt, even though he left from the same house every day.

On another day, Ms. Neal arrived back at her home around 8:00 pm to find police with guns drawn who blocked her from entering the house. She refused to allow them to enter without a warrant. This went on for hours until Ms. Neal's son gave the police his house key. The police allegedly searched the home (without a warrant) for several hours, then left a spotlight shining through the window for another hour.

The Plaintiffs say that the warrantless searches were driven by racial bias, were part of custom and practice of the police department Defendants, and that the named supervisory police officers directed, condoned, and encouraged that policy and its implementation. The Plaintiffs further say that the decision-makers in McKeesport and Allegheny County, including the named police officer Defendants, made a deliberate choice to engage in racially biased and warrantless searches. Finally, they say that Allegheny County and the ACPD provided inadequate training on appropriate search tactics and use of force.

## II.        Motion to Strike

Various McKeesport-related Defendants move to strike references to an array of newspaper and other media reports, minutes of a McKeesport City Council meeting, a "scorecard" from a non-governmental organization with that organization's assessment of arrest statistics in the City of McKeesport, and a papers relative to a lawsuit in state court about the conduct of City Council meetings in McKeesport. The Motions to Strike are premised on arguments that such references are inflammatory and "impertinent," that they are not matters that can be fairly responded to in an Answer or other pleading, and that they are, at best, simply background to the claims asserted in the FAC. The Plaintiffs oppose the Motions to Strike essentially on the grounds that the references are germane to the claims asserted, and are properly part of the FAC.

Rule 12(f) of the Federal Rules of Civil Procedure gives the Court discretion to strike redundant, immaterial, impertinent, or scandalous matter from the pleadings. Content is immaterial when it "has no essential or important relationship to the claim for relief." *Snider ex rel. Goldhirsh v. State Farm Fire & Casualty Co.*, 644 F. Supp. 3d 141, 147 (E.D. Pa. 2022) (quoting *Donnelly v. Commonw. Fin. Sys.*, 2008 WL 762085, at *4 (M.D. Pa. Mar. 20, 2008)). Content is impertinent when it does not pertain to issues raised in the complaint. *Id.* Finally, content is scandalous when it "improperly casts a derogatory light one someone, most typically on a party to the action." *Donnelly*, 2008 WL 762085, at *4. District courts have "considerable discretion" in deciding a motion to strike. *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 615 (E.D. Pa. 2015).

The Court concludes that the moving Defendants have the far better of the argument. First, this is a good point in the litigation for the Court to remind the parties that pleadings are to

contain "short and plain" statements. Fed. R. Civ. P. 8(a)(1). The FAC is none of that.[2] Further, the allegations in the extraneous material that extend outside of the actual allegations contained in the four corners of the FAC make it more difficult for the Defendants to know what to respond to and what has been accepted as factual by the Court for purposes of a motion to dismiss. Next, the moving Defendants are correct that the inclusion of the material sought to be stricken is at best background and contextual information about some of the events at issue, and attenuated information at that. Some of the events described by third-party authors from fourth-party sources may turn out to be relevant to the adjudication of claims or defenses in this action. But if so, they may come into the record in an admissible and relevant fashion further down the line. At this stage, the material appears "immaterial" under Rule 12 given the attenuated relationship to the issues at stake in the FAC at this stage of litigation.

The Motion to Strike is GRANTED, without prejudice to such stricken matter becoming part of a properly developed record at some later point in the action, if such is appropriate under prevailing law. The material referenced in the FAC at the following locations, along with the references to the material in the FAC itself,  is stricken: ¶ 20 n.1; ¶ 25 n.2; ¶ 34 n.4; ¶ 65 n.5; ¶ 66, n.6-9; ¶ 67 n.9; ¶ 68 n.11; ¶ 70 n.18.

### III.    Insufficient Service of Process

Two individual Defendants, Brenda Sawyer and Coleman McDonough, move to dismiss the case as to them for insufficient service of process.

---

[2] Length of filings appears to be a recurring problem. In addition to the prolix FAC and its attendant attachments which are the premise of the Motions to Strike, the Court notes that when Plaintiffs requested additional time to file a consolidated opposition to the Motions to Dismiss, they did not inform the Court that said consolidated brief would go well beyond the 25-page limit set in the Court's Standing Order. Consolidating their response appears to have saved little, if any, briefing space, although it did bring a sense of organization to the arguments presented.

The plaintiffs originally filed a praecipe for a writ of summons in state court on December 19, 2022, (ECF No. 38-1), and paid for the Allegheny County Sheriff's Office to effectuate service of the state court summons and complaint in January 9, 2023. (ECF No. 38-2.) The Sheriff served Allegheny County, but not McDonough himself. (ECF No. 33-1.) The original state court writ expired on February 9, 2023. (ECF No. 29-1.) The complaint was filed in state court on December 4, 2023. (ECF No. 1-3.) Defendants filed a notice of removal based on federal question jurisdiction, joined by Sawyer, on January 3, 2024. (ECF No. 1.) Plaintiffs filed the First Amended Complaint on March 15, 2024, (ECF No. 21), which was served to Mr. McDonough on March 28, 2024. (ECF No. 24.)

Service in Pennsylvania is required within 30 days after the issuance of the writ or the filing of the complaint. Pa. R. Civ. P. 401(a). While service is to occur within 30 days of the issuance of the writ, the writ can be "reissued," restarting the 30-day clock, any number of times if service is not timely effected. Pa. R. Civ. P. 401(b). While "actual notice" to a defendant may excuse "technical missteps" in serving process, *McCreesh v. City of Philadelphia*, 888 A.2d 664, 674 (Pa. 2005), a plaintiff bears the burden of showing they have made "a good-faith effort in diligently and timely serving process on a defendant." *Gussom v. Teagle*, 247 A.3d 1046, 1057 (Pa. 2021). If "a plaintiff relies on actual notice to a defendant that an action has been commenced, that actual notice has to be the result of a good faith, but improper, effort at service of process under the Rules." *Ferraro v. Patterson-Erie Corp.*, 313 A.3d 987, 1007 (Pa. 2023).

Mr. McDonough was served with the FAC shortly after its filing in this Court. Mr. McDonough argues the use of the federal process does not remediate the failure to serve him properly. But under 28 U.S.C. § 1448, service of process may be completed "in the same manner as in cases originally filed in such district court" if service had not been perfected at the state

level. Because Mr. McDonough was served a federal summons within ninety days of removal to federal court under Rule 4(m), (ECF No. 24), any defect in state service has been cured. *See Nally v. New Jersey Mfrs. Ins. Co.*, 674 F. Supp. 3d 171, 176 (E.D. Pa. 2023) (allowing ninety days to perfect service after alleged errors in serving process while litigation was in state court). So the Motion to Dismiss on the basis of insufficient service is DENIED as to Mr. McDonough.

As to Ms. Sawyer, Plaintiffs point to her joining in the notice of removal as evidence that she received actual notice of the lawsuit. But it remains their burden to show that it was their improper but diligent attempts at service that resulted in Ms. Sawyer receiving actual notice. It is unclear to the Court that paying the Allegheny County Sheriff for service followed by almost a year of inaction constitutes diligent efforts to effectuate service. Though Ms. Sawyer's joining of the notice of removal indicates she had actual notice of the lawsuit, there is no indication that her notice was a result of Plaintiffs' good-faith, but improper, efforts at service. Indeed, Plaintiffs make no showing that they made an effort to confirm that service had been completed beyond their initial request to the Allegheny County Sheriff. *See Ferraro*, 313 A.3d at 1009 (paying sheriff to effectuate service without making any efforts to inquire about or perfect service for eight months was insufficient to show good-faith effort). In the Court's view, this is not reasonable diligence.[3]

---

[3] Ms. Sawyer argues that the Pennsylvania Attorney General must also be served because she is a "Commonwealth party" as an employee of the Commonwealth. *See* Pa. R. Civ. P. 422; 42 Pa. Cons. Stat. § 8523(b). Plaintiffs say Ms. Sawyer is sued in her individual capacity and is not a Commonwealth party because the suit is unrelated to "an act within the scope of [her] office or employment." 42 Pa. Cons. Stat. § 8501. While it it would be an open question as to whether her alleged actions were within the scope of her Commonwealth duties, service on her was improper regardless and the Court need not decide that question at this point.

Thus, the Motion to Dismiss for improper service is GRANTED only as to Ms. Sawyer. She is dismissed from the case without prejudice, subject to the Plaintiffs effecting service upon her.

### IV.    Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"—but well-pleaded "factual content" requires more than "labels and conclusions," "a formulaic recitation of [the] cause of action," and "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When evaluating a Motion to Dismiss, the Court must accept all non-conclusory allegations in the complaint as true, and the non-moving party "must be given the benefit of every favorable inference." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Kulwicki v. Dawson, 969 F.2d 1454, 1462 (3d Cir. 1992)). However, the Court must "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).

Two preliminary matters. First, all claims against the "McKeesport Police Department" and the "Allegheny County Police Department" are dismissed. Those entities are simply constituent operating units of the City of McKeesport and the County of Allegheny, respectively, are therefore not entities subject to suit as distinct agencies. *See, e.g.*, *Martin v. Red Lion Police*

9

*Dept.*, 146 F. App'x 558, 562 n.3 (3d Cir. 2005) (per curiam); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997). The claims against those units of government, based on the alleged actions of employees of the agencies, will rise or fall on their own. Naming the police departments as distinct parties is superfluous. The police department entities are stricken as parties from the case caption.

Second, certain Defendants move to dismiss any claims for money damages for alleged violations of the Pennsylvania Constitution. As reflected by the amendments to Plaintiffs' Complaint, such claims have long been barred by applicable state law. *Jones v. City of Philadelphia*, 890 A.2d 1188, 1216 (Pa. Commw. 2006). Any such claims that remain against any Defendant under the now-operative First Amended Complaint are DISMISSED with prejudice. Claims for equitable relief under such state constitutional provisions may proceed further.

As to the remaining issues, the papers of record are sufficient to permit the Court to resolve those issues without oral argument. The Court resolves them as follows.

> a. *Personal Involvement by Allegheny County Police*

Allegheny County and Mr. McDonough move to dismiss claims against them because the FAC does not specifically identify ACPD officers or Mr. McDonough as involved in all events. "Police Defendants" in the FAC refers to all the officers, including the John/Jane Doe officers from either or both departments. Various Does are alleged to be present at Ms. Thompkins's home (ECF No. 21, at ¶ 27) and the presence of both police departments is specifically alleged at Ms. Neal's home. (ECF No. 21, at ¶ 51(a).) It therefore appears to the Court that ACPD officers are alleged to be involved with the searches against Ms. Thompkins and Ms. Neal, albeit not with particular specificity. This is a better argument as to Mr. Dixon: his allegations assert

interactions only with McKeesport officers, but not with officers from the County or Mr. McDonough individually.

Mr. Dixon names specific police officers involved in one distinct incident. Both named officers are alleged to be members of the McKeesport police department, not the Allegheny County police. (ECF No. 21, at ¶ 38 ("[T]wo police officers—Defendant Dante Diberadin and a John Doe McKeesport Police Officer—pulled over Mr. Dixon.").) Plaintiffs argue that the FAC pleads the addition of a possible supervisory officer, named as a John Doe Defendant. (ECF No. 21, at ¶ 48.) Plaintiffs say that discovery could reveal that this possible supervisory officer was a member of the County police, rather than a supervisor with the McKeesport police. They further argue that discovery could reveal a different way that the ACPD was involved in Mr. Dixon's traffic stop, such as through the coordination of law enforcement efforts. This is a different type of incident, a traffic stop rather than the search of a house, alleged against apparently different officers. But the Plaintiffs' argument of what "may" happen in discovery as to the search of Mr. Dixon's property are simply too speculative to proceed further, given the multi-layered contingencies of the FAC in such regards.

Thus, this portion of the Motion to Dismiss is GRANTED IN PART and the claims asserted by Mr. Dixon against Allegheny County and the ACPD are dismissed without prejudice. Plaintiffs may amend to state a plausible claim. As to the other Defendants, to the extent the Motion to Dismiss is asserted on these grounds, it is DENIED.

            b.  *Unreasonable Searches under the Fourth Amendment*

Various Defendants move to dismiss the claims asserted in the FAC that are based on alleged violations of the Fourth Amendment. There is no dispute about the warrantless nature of the searches involved here, and warrantless searches are presumptively unreasonable unless an

exception to the warrant requirement applies. *Riley v. California*, 573 U.S. 373, 382 (2014). The obligation to assert and demonstrate the application of an exception rests with the prosecution/police. Thus, the only question now before the Court is whether such an exception applies in the circumstances of this case as a matter of law. The exceptions raised by the County (and Mr. McDonough) are exigent circumstances and consent.

First, exigent circumstances that create a compelling law enforcement need for an immediate warrantless search may obviate the need for a warrant. *Kentucky v. King*, 563 U.S. 452, 460 (2011). For example, police may enter a residence without a warrant to prevent imminent destruction of evidence or in "hot pursuit of a fleeing felon." *Minnesota v Olson*, 495 U.S. 91, 100 (1990) (quoting *State v. Olson*, 436 N.W.2d 92, 97 (Minn. 1989)). Whether exigent circumstances exist is determined on a case-by-case, fact-specific basis applying a "totality of the circumstances" test. *Missouri v. McNeely*, 569 U.S. 141, 150 (2013); *Est. of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003). Searches based on exigent circumstances must also be supported by probable cause—exigent searches excuse only the lack of a warrant, not the lack of a basis to seek one if time were not of the essence. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006); *see Steagald v. United States*, 451 U.S. 204, 222 (1981) (search warrant required to enter third party's residence and seize a suspect, even when suspect is subject to an arrest warrant).

The next ground asserted is that the officers had consent to perform the searches; consent is another exception to the warrant requirement. *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973). Probable cause is also not required when there is consent to a search. *Id.* However, consent must be given voluntarily, *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011), and voluntariness is determined from all the circumstances. *United States v. Price*, 558 F.3d 270,

278 (3d Cir. 2009). The government has the burden of showing that consent was freely and voluntarily given, *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968), and not merely a submission to a claim of lawful authority. *Florida v. Royer*, 460 U.S. 491, 497 (1983).

It may turn out that each and every one of the moving Defendants are correct, and that they will prevail on one or more of those grounds as to the Fourth Amendment claims against them. The searches, warrantless as they were, may come within an exigent circumstances exception to the Fourth Amendment's warrant requirement, and/or have been carried out with the consent of a person with the proper interest in the property.[4] But each of these exceptions is fact-intensive and requires an analysis of the totality of the circumstances, and the FAC distinctly and directly controverts that there was voluntary consent or probable cause even if exigent circumstances did exist. Who is correct? The Court cannot determine that on the pleadings, and these are hallmark factual issues.

The Motions to Dismiss Fourth Amendment claims on those grounds are DENIED without prejudice to the reassertion of those argument further down the line. These claims may proceed further at this point.

      *c. Excessive Force*

The County Defendants move to dismiss claims alleging excessive force by them. They assert first that the FAC does not sufficiently tie any conduct by them to the alleged application of excessive force, and the facts of the incidents alleged don't rise to the level of "excessive force" in any event.

A claim for excessive force requires a plaintiff to show that a seizure occurred and that it was unreasonable. *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002). There is a seizure when an

---

[4] A "physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006).

officer "restrains the freedom of a person to walk away." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Whether that seizure is reasonable is viewed from the perspective of a reasonable officer on the scene under the totality of the circumstances, including "whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest, and the severity of the crime at issue." *Curley*, 298 F.3d at 279; *see Est. of Smith v. Marasco*, 430 F.3d 140, 148 (3d Cir. 2005). The reasonableness of a use of force is a fact-intensive inquiry. *Stiegel v. Peters Twp.*, 600 F. App'x 60, 65 (3d Cir. 2014).[5]

Once again, Plaintiffs plead facts that appear to contradict the assertions of the moving Defendants. Based on the allegations of the FAC, the Plaintiffs did not appear to "pose an immediate threat to the safety of the officer or others" and they were not actively resisting arrest. *Curley*, 298 F. 3d at 279. The factor most likely to weigh in the favor of the police is the severity of the crime at issue—the police were searching for a person alleged to be violent, a fact conceded in the FAC. But there are no indications, from the facts pled, that the Plaintiffs subjected to the use of force were themselves violent or dangerous, and the police are alleged to have substantially outnumbered Plaintiffs in each scenario. Beyond that, the FAC alleges that the involved Defendants were heavily armed, and none of the Plaintiffs were.

As with the other constitutional claims asserted in this case, discovery may well reveal that the Defendants are correct and their use or threat of force was reasonable, or that it was not. But these remain hallmark factual issues, and thus the Court will not dismiss the excessive force

---

[5] Plaintiffs also point to other federal courts that require a greater threat to be posed by non-suspects who are subject to seizure. *See, e.g.*, *Cook v. City of Albuquerque*, 639 F. Supp. 3d 1185, 1197 (D.N.M. 2022) ("In the determination of reasonableness of an officer's use of force, 'personal security and dignity interests, particularly of non-suspects, should also be considered.'") (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007) (en banc)). Plaintiffs further argue that the use of weapons by itself can be excessive force when used against compliant adults. *See Stiegel*, 600 F. App'x at 65-66.

claims without the benefit of factual development in discovery. This portion of the Motion to Dismiss is DENIED without prejudice. These claims may proceed further.

### d. Equal Protection Claims

Certain Defendants move to dismiss claims that their conduct denied one or more Plaintiffs the equal protection of the law under the Fourteenth Amendment. Plaintiffs assert that such Plaintiffs were targeted for more intrusive or vigorous investigative activities based on their race when compared to their white neighbors or a white spouse. The moving Defendants say that there were reasonable bases for any differential treatment.

To maintain an equal protection claim, Plaintiffs must allege that they were treated differently from others similarly situated. *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005). That differential treatment must be based on "an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right." *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting *Holder v. City of Allentown*, 987 F.3d 188, 197 (3d Cir. 1993) (alteration in original)). "Similarly situated" does not mean "identically situated," but there must be "relevant similarity." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Once again, Plaintiffs have asserted sufficient comparators to themselves in order for these claims to move forward. While Defendants may ultimately be correct that they had a rational basis for differentiating between Plaintiffs and the neighbors that Plaintiffs say are similarly situated, the FAC alleges that Plaintiffs faced a substantially different "level of police intrusion" when compared to white neighbors with a similar connection to Mr. Francis. (ECF

No. 21, at ¶ 35.) Those neighbors are sufficiently similarly situated at this stage, and the alleged racial bias is an impermissible basis on which to differentiate Plaintiffs. Again—and as with the other constitutional claims—factual development may show that there was every justification for this police behavior, or not. But Plaintiffs have made sufficient allegations to move on to discovery.

The Motion to Dismiss on those grounds is DENIED without prejudice. These claims may proceed further.

### e. *Qualified Immunity*

Regardless of the application of the defenses raised to the civil rights claims and as set out above, the Defendants argue that the individual police Defendants are entitled to qualified immunity, and all Constitutional claims for money damages asserted against them are barred.

The Court is required to resolve the question of the application of qualified immunity as early as possible in a case. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). Qualified immunity protects government officials from liability for discretionary decisions. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). It applies only to individual Defendants, and then only as to claims for retrospective money damages. *Gilson v. Pennsylvania State Police*, 175 F. Supp. 3d 528, 566 n.32 (W.D. Pa. 2016) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). A police officer, as a government official, is entitled to qualified immunity from a § 1983 suit unless the officer's conduct violates a plaintiff's clearly established constitutional rights or they were plainly incompetent in performance of their duties. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009). A right is "clearly established" when "a reasonable official would understand what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Thus, the Court need not find controlling law that is precisely on point to conclude that qualified immunity does not apply,

16

but only law in circumstances sufficiently similar such that the officer would have been on fair notice that their conduct violated a plaintiffs' federal rights. *See Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017).

That analysis will require some factual matching between what is alleged in this case and the facts in one or more cases that allegedly clearly establish the rights at issue. And once again, at this point, there are simply too many hotly contested facts yet to be resolved to make that call with finality. As alleged, the facts assert wide-ranging police activity without concern for the constitutional warrant requirement, coupled with the application of constitutionally excessive force, all implemented with an unconstitutional racial filter, much, if not all, of which would appear to run contrary to long-settled and definitive constitutional law. The Court cannot conclude, at this point, that the Defendants involved in the alleged conduct are immune. They may well turn out to be, but that is a decision that will of necessity need to be made after at least some discovery and development of a more precise factual record. *See Curley*, 298 F.3d at 278 ("[T]he imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right.").

Several Defendants also assert they are immune because they reasonably relied on the representations of the other officers on the scene, citing to two cases where officers were entitled to qualified immunity based on their objectively reasonable reliance on ultimately erroneous information from other police officers.

In *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010), the Third Circuit held that an officer who relies on the advice of a prosecutor as to whether arrest is warranted is usually protected by qualified immunity. *Id.* at 255-56. In *Hanks v. County of Delaware*, 528 F. Supp. 2d

642 (E.D. Pa. 2007), an officer was protected by qualified immunity when he relied on another officer's representations that a bench warrant was valid, because the arresting officer had "no independent indications that the warrant was not valid." *Id.* at 650. But there is not the particular legal expertise of a prosecutor involved in this case, nor is it clear from the allegations that the individual police defendants had "no independent indications" that they were going beyond what the Fourth Amendment permits. And there were no warrants alleged to have been involved here, meaning that the alleged factual context did not include a warrant independently issued by a disinterested judicial officer. Again, discovery may reveal that some officers had no way to know that Plaintiffs had not voluntarily consented to a search, or thought there was indeed a warrant, or relied on the existence or reliable report of some other fact or facts that could reasonably grant them immunity. But on the allegations of the FAC, the Court cannot conclude the Defendants reasonably exercised their discretion in a fashion that would cloak them with qualified immunity.

The Motions to Dismiss on qualified immunity grounds will be DENIED without prejudice.

### f.   *Municipal Liability Claims*

McKeesport and Allegheny County move to dismiss the claims against them as governmental entities on the grounds that such claims are in reality dressed up efforts to assert *respondeat superior* liability against them, which is of course not a permitted basis of liability for the claims asserted. *See Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978).

Plaintiffs seeking to impose municipal liability may not assert liability via the doctrine of *respondeat superior*, but may proceed under other theories: first, they can allege an official policy or a custom within the local government caused their injuries; second, they can allege that a failure or inadequacy by local government that reflected a deliberate or conscious choice led to

those injuries. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). For a policy to exist for such

purposes, a decisionmaker with final authority must have made and cause to be effected an

official proclamation, policy, or edict. *Forrest*, 930 F.3d at 105. A custom can be established by

showing that a given course of conduct, though not officially or formally endorsed or authorized,

is "so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d

845, 850 (3d Cir. 1990). For example, the Third Circuit has held that there were sufficient

allegations of custom for a municipal liability claim against the city to proceed when the

complaint contained allegations that the police department had received complaints from citizens

about improper searches and arrests to which it had failed to respond. *Est. of Roman v. City of*

*Newark*, 914 F.3d 789, 796 (3d Cir 2019). Notably, municipal liability for the city is distinct

from supervisory liability for the Superintendent or Assistant Chiefs of Police, who are not final

policymakers under Pennsylvania law. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 128-29,

135 (3d Cir. 2010).

Plaintiffs say there indeed was a municipal policy or custom, in that "decision-makers

within the City and County . . . directed officers under their supervision to engage in racially

biased and warrantless searches." (ECF No. 38, at 29.) In the FAC, they allege that the Chief and

Assistant Chief of the McKeesport Police "made the deliberate choice to engage in racially

biased and warrantless searches of Plaintiffs" and "directed, authorized, condoned, and

encouraged the violations of citizens' Constitutional rights." (ECF No. 21, at ¶¶ 60, 63.) For the

County, Mr. McDonough is also pled to have directed and authorized the violations alleged in

the FAC. (*Id.*). In some ways, these allegations of liability by the units of government are more

than a bit circular, stating in essence that because the involved police officers violated the

Constitution while their superior officers were superior officers, that convergence alone creates

liability that passes through the *Monell* sieve. If so, that sounds a lot like *respondeat superior* to the Court.

For supervisory liability, the Plaintiffs are going to have to prove personal involvement of City and County supervisors in directing and causing unconstitutional conduct. *See Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000). For liability under *Monell*, there must have been a policy that led to the unconstitutional conduct of others. The FAC is thin as to the requisite personal involvement as to the actions attacked by the FAC.[6] The conduct alleged in the FAC, taken as factual, is both fairly severe and widespread insofar as it affected three different Plaintiffs who each appear to have been targeted for enforcement across McKeesport and at differing levels of apparent connections to Mr. Francis. The Plaintiffs say that it is not readily apparent that such conduct could have taken place without the directives or approval of leaders at the police departments who are involved. Therefore, they say, the claims against the supervisory officers may proceed. But this does not plead personal involvement of those officers, nor any official policy propounded by final decision-makers at the City or County. *See Santiago*, 629 F.3d at 135 n.11.

As an alternative theory for municipal liability, Plaintiffs say that the warrantless searches and racial bias were part of longstanding police department policy to which the relevant decision-makers were deliberately indifferent. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989). When a municipality is (1) aware of a situation that police officers are likely to confront, (2) officers have a history of mishandling similar situations, and (3) the same choices are likely to cause constitutional violations in the future, the failure to provide remedial training or

---

[6] The Court would also observe that, much like the matters subject to the ruling on the Motion to Strike, the prolix assertions of the FAC in many ways appear to have been added less for the Court's consumption in ruling on legal issues than for the attention of one or more other external audiences. If so, that approach does not advance the ball in this forum.

supervision may give rise to municipal liability. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). Thus, if "a municipal actor disregarded a known or obvious consequence" of failing to train, discipline, or supervise their personnel, then municipal liability attaches. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

In the Court's estimation, the Plaintiffs have not set out sufficient factual allegations under either theory for supervisory or municipal liability to apply here. Other cases where the failure-to-train theory (or the other failure-to-remediate theories) were successful involved specific allegations as to what the relevant policymakers were aware of, how they became aware of it, and their conscious failures to remediate the problem. *See Est. of Roman*, 914 F.3d at 799-800 (discussing specific and extensive allegations of failure to train officers on warrants and lack of response to civilian complaints). The allegations that the Plaintiffs make here contain no specifics as to the deficiency in training or supervision and how the City or County was aware of such deficiency, nor what decisions the City or County made that reflect deliberate ignorance of the alleged unconstitutional conduct.

The Motion to Dismiss GRANTED, but without prejudice. Plaintiffs will be given the opportunity try and cure these deficiencies by a final amendment of the FAC.

g.  *Title VI Claims*

The City, the County, and Mr. McDonough move to dismiss claims brought under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, because, they argue, Plaintiffs fail to allege a nexus to federal financial assistance required for such a claim to proceed. All individual Defendants further say that, as individuals, they are not the recipients of federal funding and therefore cannot be liable under Title VI.

Plaintiffs argue the correct test for their ability to bring suit under Title VI is whether they are in the "zone of interest" for the federal funds rather than whether they are the "intended beneficiaries" of such funds, and that they have standing to make this claim under the zone of interest test. *See Nat'l Credit Union Ass'n v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (applying zone of interest test to Federal Credit Union Act); *Bryant v. New Jersey Dept. of Transp.*, 998 F. Supp. 438, 445-46 (D.N.J. 1998) (applying *National Credit Union* to Title VI). Courts within the Third Circuit appear to regularly use both tests. *Compare Bryant*, 998 F. Supp. at 446 (applying zone of interest test to Title VI claim) *with Brown-Dickerson v. City of Philadelphia*, 2016 WL 1623438, at *8 (E.D. Pa. Apr 25, 2016) (applying intended beneficiary test to Title VI claim). Regardless of the test used, however, Plaintiffs have not demonstrated that the federal funding at issue here—financial assistance from the federal Department of Justice, funding from the American Rescue Act, and COVID-19 relief funding under the CARES Act— bears a sufficiently close connection to the alleged discrimination here for a Title VI claim to proceed.

Title VI forbids discrimination in programs or activities receiving federal financial assistance. 42 U.S.C. § 2000d. But a plaintiff asserting a Title VI clam must show "a logical nexus between the use of federal funds and the alleged discrimination." *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 457 (W.D. Pa. 2008). Some sufficient nexus between the funds alleged to be used for a discriminatory purpose is a requirement for suit to proceed even if the Court applies a zone of interest analysis. *See Nat'l Credit Union*, 522 U.S. at 492; *Md. St. Conf. of NAACP Branches v. Md. Dept. of State Police*, 72 F. Supp. 2d 560, 567 (D. Md. 1999).

Boiled down, the Plaintiffs' claims rest on the assertion that they are residents of the involved municipalities, some of the funds noted likely went to pay and outfit police officers,

and that they benefit from such police services. Under the applicable legal principles, that logical

path is several bridges too far. None of the funding at issue here appears to have been

specifically directed at the involved police agencies, and general funding of government or

government services is simply too attenuated to support a claim under Title VI.[7] The FAC pleads

that "Plaintiffs, like all City of McKeesport and Allegheny County residents, are the intended

beneficiaries of the federal financial assistance provided to Defendants." (ECF No. 21, at ¶ 148.)

Following that logic, any resident would be able to sue under Title VI. In the Court's estimation,

that formulation in not enough to support the nexus required to assert a Title VI claim. This goes

too far, and in the Court's judgment, that attenuation cannot be cured by amendment. These

claims are DISMISSED with prejudice.

> ### h. Civil Rights Conspiracy

Defendants also move to dismiss any claim for a federal civil rights conspiracy under 42

U.S.C. § 1985. Section 1985(3) provides a remedy for a civil conspiracy to deprive a plaintiff of

their constitutional or other civil rights. For an adequate claim of civil conspiracy, a plaintiff

must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person
> or class of persons of the equal protection of the laws, or of equal privileges and
> immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a
> person is injured in his person or property or deprived of any right or privilege of a
> citizen of the United States.

*Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *United Bhd. of Carpenters*

*& Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). A claim of conspiracy under § 1985 "requires

a clear showing of invidious, purposeful and intentional discrimination between classes or

---

[7] Plaintiffs say that because CARES Act funding was used for police payroll, they are within the zone of interests of that funding. But police payroll is not the interest that Congress appropriated CARES Act funding to protect, and "public safety" is simply too abstract of an interest to support a such a claim here.

individuals" and "must involve more than one state or private agency." *Carter v. Delaware State Univ.*, 65 F. App'x 397, 400 (3d Cir. 2003) (quoting *Robinson v. McCorkle*, 462 F.2d 111, 113 (3d Cir. 1972)). Defendants protest a lack of specificity relative to such elements and as to the allegations of the FAC, as well as the fact that municipalities and their agents cannot conspire together to form a civil rights conspiracy within themselves.

The Court can make relatively short work of this issue, since the FAC alleges a series of coordinated actions as between agents and officers of McKeesport and those of the County in the efforts to search for Mr. Francis that would violate one or more rights protected by the federal Constitution, if proven. That coordination would be an agreement, and several acts were alleged to have been performed in furtherance of that agreement. These allegations are sufficiently detailed and non-conclusory to survive a motion to dismiss. Further, numerosity is satisfied because Plaintiffs allege that the City and County conspired together to deprive the plaintiffs of constitutional rights. Both the City and the County add up to "more than one state . . . agency." *Carter*, 65 F. App'x at 400. That is sufficient for these claims to proceed further.

This part of the Motion is DENIED, again without prejudice. These claims may proceed further.

### i. Intentional Infliction of Emotional Distress Claims

The Plaintiffs assert state law claims for intentional infliction of emotional distress against all Defendants. Ms. Sawyer moves to dismiss the IIED claim based on sovereign immunity as well as a failure to state a claim. The County and Mr. McDonough both move to dismiss these claims for a failure to state a claim.

Allegheny County and Mr. McDonough argue that they are protected from liability as to this claim by the Political Subdivision Tort Claims Act ("PSTCA"), which grants immunity for

causes of action arising under Pennsylvania law. 42 Pa. Cons. Stat. §§ 8541-42. Plaintiffs do not respond as to the County but argue that Mr. McDonough went beyond the scope of his duties in the facts alleged, which would place him out of PSTCA protection because it only protects "an act within the scope of . . . employment." According to the plaintiffs, his "approval and direction for officers to use violence, intimidation, and unwarranted force . . . may have exceeded the scope of McDonough's duties." (ECF No. 38, at 50.)

The question as to whether Mr. McDonough is protected, then, hinges on whether this alleged conduct was within or outside the scope of his duties. Pennsylvania uses the common-law "scope of employment" test from the Restatement of Agency. *McGuire ex rel. Neidig v. City of Pittsburgh*, 285 A.3d 887, 892 (Pa. 2022). Thus, an employee's conduct falls within their scope of their employment if:

> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master; and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*Id.* (quoting Restatement (Second) of Agency § 228 (1958)). Based on the allegations of the FAC, McDonough as the Superintendent of the County Police, is plausibly employed, at least in part, to search for those who allegedly committed crimes. There is no reason to believe the search occurred at an unauthorized time, it was done to effectuate his job duties and presumably to serve the interests of the County, and the use of force in police work is foreseeable. While there is factual debate as to the use of reasonable force, there is no reason to believe the intentions were not to perform police work. Thus, this involved alleged activity was plausibly within his duties and he is protected by the PSTCA.

Similarly, Ms. Sawyer alleges she is protected by sovereign immunity as the regional director of the Pennsylvania Bureau of Narcotics Investigations & Drug Control. In

Pennsylvania, "sovereign immunity applies even to intentional torts committed by Commonwealth defendants acting in their individual capacities." *Marrow v. Lawler*, 2020 WL 4226554, at *4 (M.D. Pa. July 23, 2020) (citing *Story v. Mechling*, 412 F. Supp. 2d 509, 518 (W.D. Pa. 2006)). But the immunity only applies when the employee is "acting within the scope of their duties." 1 Pa. Cons. Stat. § 2310. In Ms. Sawyer's case, Plaintiffs argue in their response that she was indeed acting outside of her duties. It is unclear at this stage how the duties of a state narcotics officer differ from a typical police officer, or if Ms. Sawyer was participating in the search as a former member of the local police department rather than a state narcotics officer.

In any case, the substantive elements of an IIED claim do not appear present as to her or McDonough. An IIED claim requires "extreme and outrageous" conduct that was "intentional or reckless," causing severe emotional distress. *Jordan v. Pennsylvania State Univ.*, 276 A.3d 751, 775 (Pa. Super. Ct. 2022). The bar for outrageous in extraordinarily high. The conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Minor v. Cumberland Twp.*, 258 F. Supp. 3d 518, 532 (W.D. Pa. 2017) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998). Thus, Pennsylvania courts "have allowed recovery in only very egregious cases." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997). Further, because "the definition of 'outrageousness' is subjective and nebulous . . . objective proof of an injury is required." *Gray v. Huntzinger*, 147 A.3d 924, 927-28 (Pa. Super. Ct. 2016) (requiring medical evidence for recovery on an IIED claim). Police misconduct has been held insufficient to meet this bar, even though the alleged misconduct could give rise to other constitutional claims. *See Minor*, 258 F. Supp. at 531-32 (denying summary judgment as to qualified immunity but granting it as to IIED claims).

While the officers involved here may have violated Plaintiffs' constitutional rights, violating the law in the context of the activities alleged will not sustain an IIED claim. Though the alleged police misconduct may "represent unacceptable conduct by publice officials who hold positions of trust," *Minor*, 258 F. Supp. 3d at 532, the facts are simply not sufficiently egregious to meet the very high and particular bar for the maintenance of an IIED claim as a matter of Pennsylvania substantive law.

Thus, the IIED claims are DISMISSED WITH PREJUDICE as to Allegheny County, the City of McKeesport and its related individual Defendants, and as to Mr. McDonough.

## V.    Conclusion

For the reasons above, the Motion to Strike (ECF No. 27) is GRANTED. The Motions to Dismiss (ECF Nos. 27, 29, 31, 33) are GRANTED IN PART and DENIED IN PART as to the following claims:

- All claims against Brenda Sawyer are DISMISSED without prejudice for lack of proper service. To the extent other claims asserted against Ms. Sawyer have been dismissed with prejudice, those claims will not stand against Ms. Sawyer even if proper service is effectuated.

- The McKeesport Police Department and Allegheny County Police Department are DISMISSED as parties distinct from the City and County themselves.

- Claims asserted at Counts II and IV under the Pennsylvania Constitution may proceed only as to equitable relief.

- Claims brought by Mr. Dixon against Allegheny County are DISMISSED WITHOUT PREJUDICE and with leave to amend.

- Count VI, asserting claims under Title VI, is DISMISSED WITH PREJUDICE.

- Count IX, asserting IIED claims, is DISMISSED WITH PREJUDICE.

- The claims asserting municipal and supervisory liability as to McKeesport and Allegheny County, and the affiliated individual Defendants, are DISMISSED WITHOUT PREJUDICE, and with leave to amend.

- The Motions to Dismiss are otherwise DENIED, without prejudice to reassertion of the arguments therein after appropriate factual development.

Plaintiffs shall have twenty-one (21) days to file any Second Amended Complaint. That shall be their final opportunity to amend absent an intervening change in controlling law or the discovery of facts not previously capable of being known. Defendants shall file an Answer or Rule 12 Motion within twenty-one (21) days of the filing of a Second Amended Complaint.

In the alternative, Plaintiffs may file a notice within twenty-one (21) days of the date of this Opinion that they do not intend to file a Second Amended Complaint. In that case, an Answer to the FAC is due twenty-one (21) days after such notice is filed and any dismissal without prejudice will become a dismissal with prejudice without further notice or Order.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  March 31, 2025

28